# 23-7296-cv(L), 23-7368-cv(XAP)

## United States Court of Appeals
### *for the*
## Second Circuit

MARGARITA ROSSY, as Administrator of the Estate of Jose Hernandez-Rossy,

*Plaintiff-Appellee-Cross-Appellant,*

– v.–

CITY OF BUFFALO, AND ITS AGENTS, SERVANTS AND EMPLOYEES, JUSTIN TEDESCO, BUFFALO POLICE DEPARTMENT P.O., JOSEPH ACQUINO, BUFFALO POLICE DEPARTMENT P.O., POLICE COMMISSIONER DANIEL DERENDA, Individually and in their representative capacities,

*Defendants-Appellants-Cross-Appellees,*

AMERICAN MEDICAL RESPONSE, AND ITS AGENTS, SERVANTS AND EMPLOYEES DBA AMR,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES

ROBERT E. QUINN
CITY OF BUFFALO LAW DEPARTMENT
*Attorneys for Defendants-Appellants-Cross-Appellees*
1100 City Hall
65 Niagara Square
Buffalo, New York 14202
(716) 851-4326

CP COUNSEL PRESS     (800) 4-APPEAL • (327114)

# **TABLE OF CONTENTS**

**Table of Authorities**……………………………………………………2

**Preliminary Statement**……………………………………………………6

**Jurisdictional Statement**……………………………………………8

**Issues Presented for Review**……………………………………………...9

**Statement of the Case**……………………………………………..….10

   **I.  Procedural History**……………………………………………10

   **II. Statement of Facts**……………………………………………...12

     *A. Rossy drives while smoking a "blunt", refuses to stop,*
      *and begins the threat*…………………………………………….....12

     *B. Rossy commits a felony by driving away with an officer*
      *hanging from the vehicle, nearly strikes a child on a bike,*
      *and crashes into a home*…………………………………………….13

     *C. Rossy fights with Officer Tedesco, refuses to surrender,*
      *demonstrates a willingness to do anything to avoid capture,*
      *and continues the threat*……………………………………………16

     *D. Officer Tedesco shoots a fleeing felon based on probable cause*
      *to believe that he was a threat of serious physical injury*
      *to all others in the area*……………………………………….…..21

     *E. Attorney General Investigation clears Officers of any wrongdoing*…….23

     *F. Internal Affairs Investigation finds the use of force was justified*……...24

    **III.     District Court's Decision**………………………………………..25

**Law and Argument**………………………………………………….…..27

  **I.  Standard of Review**……………………………………………..…..27

  **II. Argument**……………………………………………………..…....27

     *A. The District Court incorrectly found "material" issues of fact*…..….…28

     *B. The use of force did not violate "clearly established law"*……..……...44

**Conclusion**…………………………………………………………….…..56

**Certificate of Compliance**……………………………………….………57

## <u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Aswell v. Culpepper</u>, No. 12-CV-997, 2015 WL 1638094,
    at *5 (E.D. La. Apr. 13, 2015)…………………………………………....55

<u>Bah v. City of New York</u>, 319 F Supp 3d 698 (S.D.N.Y. 2018)…………………..52

<u>Barboza v. D'Agata</u>, 676 Fed. Appx. 9 (2d Cir. 2017)…………………..………46

<u>Billingsley v. City of Omaha</u>, 277 F.3d 990 (8th Cir. 2002)………………….....37, 56

<u>Brown v. City of New York</u>, 862 F.3d 182 (2d Cir. 2017)………………….…..…41

<u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004)…………………………………39, 45, 49

<u>Cerbelli v. City of New York</u>, 99-CV-6846 ARR RML,
    2008 WL 4449634, at *6 (E.D.N.Y. Oct. 1, 2008)…………………………43

<u>County of Los Angeles v. Mendez</u>, 581 U.S. 420 (2017)…………………………32

<u>Cowan v. Breen</u>, 352 F.3d 756 (2d Cir. 2003)……………………………………..28

<u>Davis v. McCarter</u>, 569 F. Supp. 2d 1201 (D. Kan. 2008)…………………………55

<u>Davis v. Little</u>, 851 F2d 605 (2d Cir. 1988)………………………………….……34

<u>Elias v. Vil. of Spring Val.</u>, 81 F Supp 3d 312 (S.D.N.Y. 2015)…………..………40

<u>Estate of Jaquez v. City of New York</u>, 104 F.Supp 3d 414 (S.D.N.Y. 2015)..…….42

<u>Estate of Jaquez by Pub. Adm'r of Bronx County v. City of New York</u>,
    706 Fed. Appx 709 (2d Cir. 2017)………………………………….………42

<u>Finnegan v. Fountain</u>, 915 F.2d 817 (2d Cir. 1990)………………………………29

<u>Ford v. Childers</u>, 855 F.2d 1271 (7th Cir. 1988)…………………………………33, 55

<u>Fortunati v. Campagne</u>, 681 F.Supp 2d 528 (D. Vt., 2009)………………..……32

<u>Fortunati v. Vermont</u>, 503 Fed Appx 78 (2d Cir. 2012)……………………….…..42

Francis v. Fiacco, 942 F3d. 126 (2d Cir. 2019)……………………………………29, 49

Golino v. New Haven, 950 F.2d 864 (2d Cir. 1991)………………………………45

Gonzalez v. City of Schenectady, 728 F.3d 149 (2d Cir. 2013)…………………..46

Graham v. Connor, 490 U.S. 386 (1989)……………………………………29, 31, 42

Haugen v. Brosseau, 339 F.3d 857 (C.A.9 2003)……………………………..……39, 49

Heien v. North Carolina, 135 S.Ct. 530 (2014)………………………………………49

Hemphill v. Schott, 141 F.3d 412 (2d Cir. 1998)…………………………………..39

Ivery v. Baldauf, 284 F.Supp 3d 426 (W.D.N.Y. 2018)……………………………32

Johnson v. United States, 576 U.S. 591 (2015)………………………………………38

Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006)……………………………………..32

Kisela v. Hughes, 138 S.Ct. 1148 (2018)………………………………………38, 53

Martinez v. Hasper, 21-2975, 2023 WL 4417355 (2d Cir. July 10, 2023)…….27, 30

Mecham v. Frazier, 500 F.3d 1200, 1205 (10th Cir. 2007)…………………………41

Mitchell v. Forsyth, 472 U.S. 511 (1985)…………………………………………….8

Mullenix v. Luna, 577 US 7 (2015)………………………………………………..32

Naumovski v. Norris, 934 F.3d 200 (2d Cir. 2019)……………………………..……29

N.S. by and through Lee v. Kansas City Bd. of Police Commissioners,
        35 F.4th 1111 (8th Cir. 2022)……………………………………………..………55

N. S., only child of decedent Stokes v. Kansas City Bd. of Police Commissioners,
        143 S.Ct 2422 (2023)…………………………………………………….………55

O'Bert ex rel. Estate of O'Bert, 331 F.3d 29 (2d Cir. 2003)………………..……..35

O'Brien v. Barrows, 556 Fed. Appx 2 (2d Cir. 2014)……………………………54

Outlaw v. City of Hartford, 884 F.3d 351 (2d Cir. 2018)…………………………31

Pearson v. Callahan, 555 U.S. 223 (2009)…………………………………………49

Phillips v. Middletown, 17 CV 5307 (CS) 2018 U.S. Dist.
LEXIS 163308 *14 n 4 ( S.D.N.Y. September 9, 2018)………………...…33

Plumhoff v. Rickard, 572 U.S. 765 (2014)…………………………………….…...49

Public Adm'r of Kings County v. United States, No. 88 CIV. 0190 (BN),
1989 WL 116307 at *7 (S.D.N.Y. Sept. 26, 1989)…………………………24

Ridgeway v. City of Syracuse, 16 CV 618 (GTS)(ATB) 2019 U.S. Dist.
LEXIS 16003 *35 n 10 (N.D.N.Y. February 1, 2019)……………………..34

Roguz v. Walsh, 09-1052 TLM, 2013 WL 1498126, at *8
(D Conn Apr. 5, 2013)……………………………………………………..41

Rose v. City of Utica, 14 CV 1286 (BKS)(TWD) 2018 U.S. Dist.
LEXIS 220803 *33 (N.D.N.Y. April 19, 2018)………………………...…33

Ryder v. City of Topeka, 814 F.2d 1412, 1419 n. 16 (10th Cir.1987)……………37

Salim v. Proulx, 93 F.3d 86 (2d Cir. 1996)……………………………...…28, 30

San Francisco v. Sheehan, 135 S. Ct. 1765 (2015)…………………...…43, 49

Saucier v. Katz, 533 U.S. 194 (2001)…………………………………………45, 46

Savage v. City of Memphis, 620 F. App'x 425 (6th Cir. 2015)……………..…….55

Savino v. City of New York, 331 F.3d 63 (2d Cir. 2003)……………………….…28

Scott v. City of Rochester, 17-CV-6311-FPG, 2019 WL 4016165, at *5
(W.D.N.Y. Aug. 26, 2019)…………………………………….…34, 54

Scott v. Harris, 550 U.S. 372 (2007)……………………...……………..…37, 39

Shechter v. Comptroller of the City of New York, 79 F.3d 265 (2d Cir. 1996)…….46

Seidman v. Colby, No. 1:18-CV-202 (TJM/CFH), 2021 U.S. Dist.
        LEXIS 228706, at *15 (N.D.N.Y. Nov. 30, 2021)……………….……….44

Stephenson v. Doe, 332 F.3d 68 (2d Cir. 2003)……………………………………34

Strong v. Gorman, 310 F.Supp. 3d 380 (W.D.N.Y. 2018)…………………………48

Sullivan v. Metro. Transit Auth. Police Dept., 2017 WL 4326058,
        *4 (S.D.N.Y. 2017)……………………………………………………....41

Sykes v. United States, 564 U.S. 1 (2011)………………………………………...38

Tenenbaum v. Williams, 193 F.3d 581 (2d Cir., 1999),
        cert. denied, 529 U.S. 1098 (2000)……………………………………...27

Tennessee v. Garner, 471 U.S. 1 (1985)……………………………………7, 37, 48

Thevenin v. French, 850 Fed. Appx. 32 (2d Cir. 2021)………………….……..27, 51

Thompson v. Hubbard, 257 F.3d 896 (8th Cir. 2001)…………………….…..……55

Tierney v. Davidson, 133 F.3d 189 (2d Cir. 1998)……………………….……..…34

Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999)………………..….…..41

Virginia v. Moore, 553 U.S. 164 (2008)………………………………….……..…41

Wertish v. Krueger, 433 F.3d 1062 (8th Cir. 2006)……………………..….……..41

Whren v. United States, 517 U.S. 806 (1996)……………………………..…….32, 41

White v. Pauly, 580 U.S. 73 (2017)……………………………………………..44, 45

**STATUTES**

42 U.S.C. §1983……………………………………..…………..…..7, 24, 27, 43
28 U.S.C. §1291……………………………………………………..…………..8
FRCP 12(c) and 56…..………………………………..………….....5, 7, 8, 25, 38

## PRELIMINARY STATEMENT

The facts in the record, even assuming them in the light most favorable to the Plaintiff, establish that the Decedent, Jose Hernandez Rossy ("Rossy"), was a fleeing felon who posed a threat of serious physical harm to officers and civilians when Buffalo Police Officer Justin Tedesco lawfully shot on May 7, 2017.

Plaintiff claims that "the evidence shows that the defendants saw the decedent driving a white Acura SUV and targeted him with the intent to unlawfully stop him, and violate his civil rights. Further, the proof shows that the defendants intentionally concealed their unlawful conduct from the outset, broke a multitude of rules, and began fabricating and falsifying evidence as their unlawful actions unfolded. The evidence also shows the defendants knew that the decedent was unarmed, and beat him and shot him in the back after they pursued and then cut off the decedent's car in violation of Buffalo police regulations. Immediately after cutting of the Acura, the proof shows that the defendant Acquino injured the right side of his head and jaw when he recklessly opened and dove into the driver's door of the moving vehicle to grab Mr. Rossy, and thereby tore his ear on the door pillar moving forward as he jumped headfirst into the car." [Dkt. No. 106, p. 2, ¶4].

While much of this is disputed, particularly the speculation which lacks evidentiary support, even assuming all of it were true, the City Defendants would still be entitled to judgment as a matter of law under the relevant legal standards.

Under these alleged facts, regardless of whether Rossy had a gun at the time, regardless of the officers' motivations, regardless of whether Offcer Acquino was injured by a gun or the car door, Officer Tedesco's use of force was "objectively reasonable" under the circumstances reasonably believed at the time and did not violate "clearly established" law. Plaintiff therefore cannot prove a constitutional violation and the City Defendants are protected by "qualified immunity".

The District Court's Decision and Order incorrectly found that there were "material" issues of fact to warrant partial denial of our Motion. Neither "probable cause" nor the cause of Officer Acquino's injury is a "material" question of fact as to whether the Officers' actions were "objectively reasonable" or on the qualified immunity claim. The Complaint should have been dismissed in its entirety as Plaintiff failed to raise a question of material fact as to any claims.

Respectfully, Plaintiff's argument on Qualified Immunity, and the Court's analysis did not address the applicable standards. Even assuming the Second Circuit does not require a case directly on point, they require something beyond vague generalization of general standards and the actual Supreme Court precedent fully supports the City Defendants' actions. The Plaintiff's reliance on <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985) has been expressly rejected by the Supreme Court on numerous occasions because Garner is cast at a high level of generality, and therefore does not clearly establish that the Officers decisions were unreasonable.

7

## **JURISDICTIONAL STATEMENT**

This appeal arises from the September 5, 2023, Decision and Order of the United States District Court for the Western District of New York (William M. Skretny, District Judge), which granted in part, and denied in part, Defendants-Appellant's Motion for Dismissal and Summary Judgment pursuant to Federal Rules of Civil Procedure 12(c) and 56. Special Appendix [Dkt. No. 142]. The Court below had subject matter jurisdiction pursuant to 28 U.S.C.A. § § 1331 and 1343. This Court has jurisdiction over this appeal pursuant to 28 U.S.C.A. § 1291.

As limited by our Notice of Appeal, this appeal is from the District Court's denial of Defendants' Motion for Summary Judgment on "qualified immunity" grounds. [Dkt. No. 147]. Pursuant to 28 U.S.C. §1291, the Court of Appeals has appellate jurisdiction over this interlocutory appeal because the denial of qualified immunity on a question of law is subject to immediate appeal. *See,* Mitchell v. Forsyth, 472 U.S. 511, 530, (1985).

## <u>ISSUES PRESENTED FOR REVIEW</u>

The legal issues raised on Defendants' appeal are:

  (I.)   Whether the District Court erred in finding "material" issues of fact?

  (II.)   Whether the Officers actions violated "clearly established law"?

.

## STATEMENT OF THE CASE

### I.    Procedural History

Plaintiff commenced this action pursuant to 42 U.S.C. §1983 and ancillary New York State law claims against Defendants  CITY OF BUFFALO, JUSTIN TEDESCO, JOSEPH ACQUINO and DANIEL DERENDA ("City Defendants"), and Co-Defendant, American Medical Response d/b/a/ "AMR" (hereinafter, "AMR"), by the filing of a Complaint on September 21, 2017. [Dkt. No. 1] The City Defendants filed and served an Answer with Cross-Claims on October 19, 2017. [Dkt. No. 8]. AMR filed and served an Answer on October 20, 2017. [Dkt No. 9].

Discovery was completed and the parties engaged in dispositive Motion Practice.[1]  The City Defendants filed a motion to dismiss and for summary judgment pursuant to  Federal Rule of Civil Procedure 12(c) and for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of Plaintiff's Complaint, in its entirety on April 6, 2022.[Dkt No. 107]. Plaintiff also Moved for Summary Judgment on April 6, 2022. [Dkt. No. 103; Dkt No. 104; Dkt No. 105; Dkt No. 106]. Each side submitted their response to the City Defendants' motion on June 6, 2022. [Dkt. No. 118; Dkt No. 119; Dkt No. 120; Dkt No. 121]. [A-1006].  Each side submitted a Reply on June 20, 2022.  [Dkt. No. 131; Dkt No. 132].

---

[1] Plaintiff and AMR also brought Motions against each other. [Dkt. No. 98; Dkt No. 99]. Plaintiff's Motion was denied, AMR's Motion was granted in part, denied in part, and currently the Plaintiff's Fifth Cause of Action asserting a response-time claim against AMR remains. [Dkt. No. 143]. Those Motions are not relevant to this Appeal and therefore are not addressed further.

The court below issued its Decision and Order ("Decision") on September 5, 2023, denying Plaintiff's Motion in its entirety, and granting the City Defendants' Motion in part, and denying in part. [Dkt. No. 142].

Specifically, the Court granted the City Defendants' summary judgment on that portion of the First Cause of Action alleging an Eighth Amendment violation, as well as the Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action. Summary judgment as denied to the City Defendants on the portion of the First Cause of Action alleging violations of Plaintiff's Fourth and Fourteenth Amendment rights. [Dkt. No. 142, pg. 2, 38].

The City Defendants filed a Motion for Reconsideration of the Denial of their Motion on September 9, 2023. [Dkt. No. 144]. The Plaintiff filed a Memorandum in Opposition on October 4, 2023. [Dkt. No. 146]. The City Defendants' filed a Reply on October 11, 2023. [Dkt. No. 149].

The City Defendants filed a timely Notice of Interlocutory Appeal on October 5, 2023. [Dkt. No. 147]. Plaintiff also filed a purported Notice of Interlocutory Appeal on October 5, 2023. [Dkt. No. 148]. That purported "Cross-Appeal" is also before this Court under Civil Index No. 23-7368.

On October 20, 2023, the District Court issued a Text Order denying the City Defendants' Motion for Reconsideration, finding that the filing of the Notice of Appeal divested the Court of Jurisdiction to rule on the Motion for Reconsideration.

## II.    Statement of Facts.

*a. Rossy drives while smoking a "blunt", refuses to stop, and begins the threat.*

On May 7, 2017, Buffalo Police Officer Justin Tedesco and Buffalo Police Officer Joseph Acquino were partners on the 3:30 p.m. to 1:30 a.m. shift on routine patrol in their City of Buffalo Police Department patrol vehicle. [Dkt. No. 1, p. 2 ¶3; Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

At around 5:10 p.m., Officers Tedesco and Acquino were driving north on East Street, with the windows of their patrol vehicle down. [Dkt. No. 107-4,; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Tedesco was the driver and PO Acquino was the passenger. [Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. The Officers noticed smoke and smelled burning marijuana coming from the open window of a white Acura SUV traveling in front of them. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]

Officers Tedesco and Acquino attempted to stop Mr. Rossy's vehicle after observing that the decedent was operating the vehicle while smoking marijuana. [Dkt. No. 107-4, p. 2. 3; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Tedesco activated the horn and lights, but Rossy did not stop his vehicle. [Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. No. 106-23]. Officer Tedesco then pulled around and in front of the Decedent's vehicle, cutting it off, in order to force the vehicle to stop. [Dkt. No. 104, ¶5; Dkt. No. 107-4; Dkt. No. 107-

5; Dkt. No. 107-7; Dkt. No. 107-10]. Both Officers approached the driver's side of the vehicle and observed Mr. Rossy smoking what appeared to be a marijuana cigarette [Dkt. No. 104, ¶5; 106-17; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino then began asking Mr. Rossy questions. [Dkt. No. 106-17; 106-19; Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Mr. Rossy did not verbally respond to those questions and instead moved his hand toward the top right pocket of his jacket. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Officer Acquino believed that Mr. Rossy was reaching for a weapon, and, in response, he leaned into the vehicle through the driver's side door and reached toward Mr. Hernandez Rossy's jacket pocket. [Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino felt something "hard" in Mr. Rossy's pocket. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino believed that he felt a "small caliber gun" and yelled "Gun! Gun!". [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Timothy Best ,who was then in the fourth grade, told the police "I was outside riding my dirt bike on Garfield and Hartman. I see this cop with his lights behind this white car on Garfield. Then the white car wasn't stopping. That's when the cop did the siren and then pulled his cop car toward the front of the white car to stop it….the cop opened the door – that's when the driver just hit the gas". [Dkt. 106-19].

*b. Rossy commits a felony by driving away with Officer Acquino hanging from the vehicle, nearly strikes a child on a bike, and crashes into a home.*

13

Rossy pulled Officer Acquino further into the vehicle, while he tried to close the driver's side door, and accelerated forward with the Officer partially inside, still reaching across Mr. Rossy's lap. [Dkt. No. 104, ¶6; Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. As the car accelerated, the driver's side door remained open with Officer Acquino hanging from the vehicle. [Dkt. No. 104, ¶6; Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Officer Acquino observed Timothy Best on his bicycle in front of the vehicle as it accelerated forward. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. As Rossy continued to accelerate, Officer Acquino was still struggling with him. [Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. As the vehicle continued to accelerate forward, Officer Acquino looked up and saw that Rossy's vehicle was about to strike the boy. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino grabbed the steering wheel and turned it clockwise, causing Rossy's vehicle to turn to the right so the vehicle would avoid striking the boy. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Timothy told the Police "and that's right when he almost hit me and it damaged the front of the cop car. The white car then hits into a house – and I took off and told my dad". [Dkt. No. 104, ¶7; Dkt. 106-19]. Timothy also gave a statement to the Attorney General, wherein he confirmed that "he felt he had to ride

14

out of the area where he was standing on his bike to avoid being hit by the SUV". [Dkt. 106-19; Dkt. 106-20].

Witness Allan Morrison testified, "a little boy was on his bike that almost got killed." [Dkt. No. 106-24, p. 22]. "At this point when I went out there the first thing I saw was him pretty much coming from right where the car was that just missed him, and I remember him kind of panicking and he went home". [Dkt. No. 106-24, p. 27].  Mr. Morrison, who also filmed a cell phone video of the incident, testified, "I do remember him saying – holding his ear and screaming I've been shot, I've been shot, call 911. That, I do remember." [Dkt. No. 106-24, p. 48].

Photographs depict the damage done when Rossy's vehicle struck the stopped patrol vehicle, ran over a stop sign, crossed a row of bushes, and struck a house, coming to a stop from such a speed that the airbag was deployed. [Dkt. No. 104, ¶7; Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino heard what he described as the "loudest fireworks" go off in his right ear and he felt a burning sensation. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. He exited the vehicle bleeding, with his right ear nearly detached from his head. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. No. 107-29]. Officer Acquino believed Mr. Rossy had just shot him in the head and he yelled to his partner "Justin I'm shot" and "Help me!". [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Candice Olivera, who was in an enclosed porch at nearby 28 Hartman, "heard a loud bang" but wasn't sure what it was. She stepped onto the top step of her house entrance and heard someone yelling 'help me, help me, I've been shot". He repeated that he had been shot more than once". [Dkt. No. 107-24, Dkt. No. 107-27].

c.    *Rossy fights with Officer Tedesco demonstrating a willingness to do anything to avoid capture, and continuing the threat.*

Emanual Ortiz heard the Plaintiff's car strike his building, he told the kids to stay in the house and went to the back door to see what was going on. [Dkt. 106-16, p. 15]. Once outside he saw "the subject was still in the driver seat of the vehicle. The two officers were kind of like wrestling with him as he was in the driver seat. The officer that was injured at the time started yelling out help me Oh My God help me. There appeared to be blood coming down his face." [Dkt. 106-16, p. 15].

After the car struck the house, occupied by a family of 5 with three children, PO Tedesco saw PO Acquino emerge from Decedent's vehicle with a bleeding head and partially detached ear and heard PO Acquino yelling that he had been shot. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. No. 107-29]. PO Tedesco entered Mr. Rossy's vehicle through the passenger's side and both officers wrestled Mr. Hernandez Rossy out of the vehicle. [Dkt. No. 104, ¶11; Dkt. No. 107-4; Dkt. No. 107-5; Dkt. No. 107-7; Dkt. No. 107-10].

Mr. Ortiz described, "[a]t that time the officers had gotten him down to the ground but he was fighting back. The injured officer kept saying Oh My God Help me, Shoot him and he said that a couple more times to Shoot him. The subject then got to his feet and was attempting to get away from him. I was trying to close the door so the subject wouldn't run into my direction." [Dkt. No. 104, ¶12; Dkt. 106-15].

Around this time, several civilians called 911 stating that an officer had been shot. [Dkt. No. 107-4; Dkt. 107-30] The Buffalo Police Department "Complaint Summary Report" recorded a civilian 911 call at 17:13:09, "officer has been shot", and at 17:13:31, that same caller "says he was shot in the ear". A second civilian 911 call came in at 17:13:16, "CALLER STATES OFFICER DOWN". A third civilian 911 call came in at 17:13:20, of "inv officer in troubled". A fourth civilian 911 call came in at 17:13:22, "caller said officer has been shot". At 17:13:31, "suv has crashed into house". [Dkt. No. 106-3; Dkt. No. 106-4; Dkt No. 106-5; Dkt. No. 106-6, Dkt. No. 106-7].

Mr. Ortiz observed, "[t]he driver's side officer tumbled out of the vehicle with the driver and fell through the bushes onto the sidewalk. And when he got, the officer got back up, his ear was torn down to the lobe and the driver was like still wrestling with him, like they was trying to run from him and the officer was like grabbing and pulling him". [Dkt. 106-16, p. 22]. Mr. Ortiz testified that Rossy was "wrestling

17

with the officer, pulling away from him…as soon as they got down on the ground he got up really quick and was like trying to run away from them". [Dkt. No. 106-16, p. 56-58]. Ortiz testified that he did not hear Officer Acquino say that he had been "shot". [Dkt. No. 106-16, p. 66-67].

Mr. Ortiz then closed the door and was not able to see the part of the events where two officers were in the street, was not able to see whether or what type of struggle occurred, was not able to see the gun shots fired, and went to console his three children in house. [Dkt. No. 106-16, p. 43-50, 87].

Officer Tedesco tried to restrain Rossy, who vigorously resisted. [Dkt. No. 104, ¶13; Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Tedesco told Rossy to get on the ground. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Officer Acquino moved away from the struggle and was yelling, "Help me…I've been shot…Shoot him!". [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt No. 106-25]. Officer Tedesco pulled out his service weapon, pointed it at Rossy, and said "get down" three times. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Plaintiff alleges that this physical struggle continued for a minute to a minute and a half. [Dkt. 120 p. 7; Dkt. 106-11, p. 171)

Elizabeth Brennan was driving down Garfield Street towards Niagara with her boyfriend Mark VanDusen. As they were approaching Peoria street, they saw the two officers struggling with Rossy. She described, "we pulled up next to where they

were scuffling, the 2 officers were trying to get him down. One officer was hurt and his ear was really bloody and barely attached to his head." Dkt. No. 106-68.

Mr. VanDusen testified, "[t]here was a lot of flailing between both sides, swinging, trying to break free, people grabbing his shirt, police grabbing his shirt and ripping it off, slapping his hands, pushing, just kind of swinging madness. It didn't look like a professional fight, but it was just a bunch of flailing and trying to break free from two police officers that were trying to detain and stop a man". [Dkt. No. 106-22, p. 32.

Gino Fresco, came toward the scene "[b]ecause the kids were out there and everything, playing" where he saw "a car crashing into the side of a house, officer getting out, holding the side of his ear, screaming and I seen blood everywhere. Dkt. 108-18, p. 71. "

Mr. Juan Mendez also saw "2 uniformed Buffalo Police officers in a struggle with a guy I know as Jose Hernandez". Mr. Mendez was "standing near the stop sign at the corner looking down Hartman and I saw the officers and Jose falling through the busies near the car, and onto the sidewalk." Mr. Mendez saw "Jose get his hoody and his shirt pulled off by the bald cop with the tattoo on his arms. Jose was still on his feet and the other officer was still fighting with him. They were grabbing each other by wrapping arms, but Jose wasn't letting him get him. Jose looked like he was wrestling with the cop, trying to avoid going down on the ground"

19

Mr. Mendez also heard Officer Acquino in the street "yelling ' shoot – shoot he has a gun – he shot me!" [Dkt. 106-25].

Rossy continued to fight, reaching for PO Tedesco's gun, before twisting out of his sweatshirt and running away. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. PO Tedesco attempted to physically restrain and subdue Mr. Hernandez Rossy and again stated he would be shot if he did not stop. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. PO Tedesco was unable to maintain a grip on Mr. Hernandez Rossy, who was now shirtless, and he dropped to one knee and called out "Stop". [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Mr. Fresco described, "The other officer tried to arrest the other guy. He was fighting with him." {Dkt. 106-18, p. 11-12]. "The second officer was already like right there. Right here, boom. Officer was like right here screaming. Blood everywhere. This other officer's trying to arrest the suspect. They were just fighting. It ain't like he pulled his gun out right away and tried to shoot the man. He tried to arrest him, and they were struggling and he ran away". [Dkt. 106-18, p. 29].

Officer Acquino was "just holding his head yelling, 'help, help'. Dkt. 106-17. Mr. Fresco described, "I seen him fighting with them, yeah…they were definitely scuffling.". [Dkt. 106-18, p. 42]. Mr. Fresco stated, "[i]t looked like they were just trying to grab him. It wasn't like they were trying to beat him up or something. They just tried to grab him and apprehend him". [Dkt. 106-17].

*d. Officer Tedesco shoots a fleeing felon based on probable cause to believe that he was a threat of serious physical injury to all others in the area.*

Plaintiff alleges the "eyewitnesses from the house where the Acura crashed testified that it was at this moment that he heard defendant Acquino begin yelling a defendant Tedesco to shoot Mr. Rossy, as Mr. Rossy began running eastbound up the sidewalk away from Tedesco who then assumed a knee stand and fired three shots at Mr. Rossy's back." [Dkt. No. 120, pg. 8; Dkt No. 106-16, pg. 55-57).  Mr. Rossy continued to run away and PO Tedesco then fired three shots. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10].

Arelene Kropa, at nearby 37 Peoria, "could see the male and the officer in a violet fight.  The man had the officer's head in like a hold and slammed the officer to the ground….Then the male broke away from the officer and pointed his arm at the officer and I heard the third shot." [Dkt. No. 107-20].

Mr. VanDusen described, "[t]he guy got loose and I seen one cop with his ear hanging off his head and the other co dropped to his knee and fired 2 shots to try and stop him from fleeing. Dkt. No. 106-1 Mr. VanDusen testified, "I remember seeing officers trying to apprehend a man that should have listened to the law enforcement.". [Dkt. 106-22, p. 40-45].  Mr. VanDusen stated, "I think the 2 shots were justified". [Dkt. 106-21]

Mr. Fresco heard Officer Tedesco say, "stop, stop, stop', he just kept running, that's when he started shooting, that's when he thought his buddy was shot or

21

something.". [Dkt. 106-17]. Mr. Fresco, testified "[s]houldn't have been scuffling with him, man. He'd still be here if he wasn't scuffling around with the man and ran.". [Dkt. 106-18, p. 92].

Officer Tedesco did not think any of the bullets had struck Rossy, who continued to run for a number of blocks. [Dkt. No. 107-4; Dkt. No. 107-4]. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10]. Officers responded to the calls and were flagged down by civilian witnesses and pointed in the direction of a gate across a driveway, which Rossy was laying behind. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. 107-12]. Officer Tedesco then followed, finding Rossy the area of Tonawanda Street. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. 107-12].

Other officers arrived at Garfield Street and found Officer Acquino laying on the ground, semi-conscious. [Dkt. No. 107-4; Dkt. No. 107-7; Dkt. No. 107-10; Dkt. 107-17]. Officer Tedesco saw and heard other officers tending to Rossy at the time. [Dkt. No. 107-4]. Officers located what appeared to be a gunshot wound on Mr. Hernandez Rossy's arm and applied a tourniquet was applied. [Dkt. No. 107-4; Dkt. 107-12]. AMR ambulance personnel transported Mr. Hernandez Rossy and PO Acquino to ECMC. [Dkt. No. 107-4; Dkt. 106-34].

Rossy was taken to Erie County Medical Center where he was found to have "Puncture sustained to left bicep and left tricep is through and through, small bleeding from both puncture wounds to left upper arm, tourniquet remains intact to

left upper arm from prior to arrival". [Dkt. 106-33]. The cause of death was determined to be "GUNSHOT WOUND OF LEFT UPPER EXTREMITY". [Dkt. No. 106-72]. The medical examiner also found "Two scars which may represent a remote gunshot wounds are located in the posterior left lower extremity", but determined that was a result of a "past history of being shot in the left leg with retained bullets". A toxicology examination determined that Rossy tested positive for Benzodiazepines, Cannabinoids, and Oxycodone. [Dkt. 107-72].

Officer Acquino was also seen at Erie County Medical Center, where Dr. William Belles performed surgery to reattach Officer Acquino's ear. As to the cause of this injury, "He stated there was a directional tear to the ear. Dr. Belles was asked if he could be certain if only a gunshot would cause such an injury and he stated, it would be difficult to say. There could be many causes of an injury such as this but it would require significant force to cause this type of damage." [Dkt. No. 106-70].

e.    *Attorney General Investigation clears Officers of any wrongdoing.*

Pursuant to New York State Executive Orders No. 147 and 147.10 the Office of the Attorney General ("OAG") investigated this incident and issued  a Report on the Investigation into the Death of Jose Hernandez Rossy [Dkt. No. 107-4]

The OAG Report concluded, "[h]ere, the evidence, including the forensic analysis and civilian accounts, make clear that it was reasonable for PO Tedesco to believe that Mr. Hernandez Rossy had just committed a felony involving the use of

physical force and that he was attempting to escape. When PO Acquino reached into Mr. Hernandez Rossy accelerated his vehicle forward, while PO Acquino was partially inside and almost struck a child who was on a bicycle. PO Tedesco saw his partner, PO Acquino, emerge from Mr. Rossy's vehicle, bleeding from his head with his ear partially detached and yelling that he had been shot. Several civilian witnesses also believed PO Acquino had been shot and relayed that belief in their calls to 911. Mr. Hernandez Rossy thereafter resisted arrest and failed to heed PO Tedesco's command to "get down." [Dkt. No. 107-4, p. 16]

The OAG Report continued, "[i]t was therefore reasonable for PO Tedesco to believe that Mr. Hernandez Rossy had just committed several serious felonies, including the attempted murder of PO Acquino" [Dkt. No. 107-4, p. 16]

The OAG Report continued, "[t]he fact that PO Tedesco and PO Acquino were ultimately mistaken in their belief that Mr. Hernandez Rossy was armed with a dangerous weapon that had shot PO Acquino does not change the reasonableness of the belief that they held *at the time* of the shooting. An 'officer is not required to be absolutely certain of his facts before taking…action.' *Public Adm'r of Kings County v. United States*, No. 88 CIV. 0190 (BN), 1989 WL 116307 at *7 (S.D.N.Y. Sept. 26, 2989) (court further noting that an officer's belief that another is armed with a deadly weapon or is about to use deadly physical force, may be reasonable –

24

and the use of deadly physical force justified – even if his belief turns out to be mistaken" [Dkt. No. 107-4, p. 16].

*e.    Internal Affairs Investigation finds the use of force was justified.*

On April 12, 2018, "Following the review of IAD Case 2017-008, the Buffalo Police Commissioner Byron Lockwood "determined that the action of the target officer were appropriate in consideration of the circumstances and that his use of force relating to the incident was justified" and "[a]s a result, I have determined that the matter be closed with a finding of "Exonerated," and that the officer's disciplinary file should reflect that finding." [Dkt. 107-31, p. 11].

## III.    District Court's Decision and Order.

As the City Defendants proceed herein on the facts in the light most favorable to Plaintiff, the District Court's Decision recited "Plaintiff's Version", and we therefore adopt those for the purposes of jurisdiction herein. [Dkt. No. 142, pg. 4-6] With respect to the excessive force claim, in its Decision, this Court found:

"Both sides agree that Officer Acquino's ear was injured when he was leaning into Hernandez-Rossy's car but disagree about the cause of the injury. If Hernandez - Rossy shot Officer Acquino - or Officer Tedesco reasonably believed that Hernandez - Rossy did so - a reasonable jury could conclude that Officer Tedesco had a reasonable basis to pursue and use force upon Hernandez- Rossy as he attempted to flee. Such a finding could result in the denial of Plaintiff's civil rights claims and the extension of qualified immunity to the officers. The factual disagreement as to the cause for Officer Acquino's injury, however, precludes entry of judgment as a matter of law for either side.

25

As shown by these competing versions of the facts, there remain numerous disputed issues of material fact. Some of these issues, such as whether the officers had probable cause to stop Hernandez-Rossy and the cause of the injuries to Officer Acquino (and ultimately the justification for Officer Tedesco' s use of lethal force), are material and preclude summary judgment.

These issues cannot be resolved on summary judgment for either party. The City Defendants' motion for summary judgment on Plaintiff' s remaining claims alleged in her First Cause of Action is therefore denied. Plaintiff' s competing motion for summary judgment is also denied."[Dkt. No. 142]

With respect to qualified immunity, the Decision specifically provides:

The City Defendants also invoke qualified immunity for Officers Acquino and Tedesco. But whether it was objectively reasonable for the officers to believe that their actions did not violate Hernandez-Rossy's constitutional rights is also fact dependent, as the City Defendants concede (City Defs. Response, ¶ 19). And as indicated above, this Court disagrees with the City Defendants' contention that the facts are undisputed and well documented (cf. Memorandum of Law in Support of the City Defendants' Motion City Defs. Memo"), Docket No. 107-1, p. 19). Consequently, the disputed issues of material fact preclude extending qualified immunity to Officers Acquino or Tedesco at this stage. Therefore, the City Defendants' motion for summary judgment seeking qualified immunity is denied. [Dkt. No. 142, pg. 19]

The District Court ultimately concluded that:

The parties here present two materially different versions of the traffic stop and subsequent shooting of Jose Hernandez- Rossy. Those factual differences— e.g., whether there was probable cause to stop Hernandez-Rossy; whether Hernandez- Rossy shot Officer Joseph Acquino; whether Officer Justin Tedesco had grounds to use lethal force— are material and preclude summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims asserted in her First Cause of Action or granting qualified immunity to Officers Tedesco and Acquino. Defendants are entitled to summary judgment or dismissal of all other claims. Their motion for summary judgment will therefore be granted in part and denied in part, while Plaintiff' s motion will be denied in its entirety. [Dkt. No. 142, pg. 38].

## <u>LAW AND ARGUMENT</u>

### I.    STANDARD OF REVIEW

The Court of Appeals reviews a District Court's grant or denial of summary judgment *de novo*, construing the evidence in the light most favorable to the nonmoving party. *See*, <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 593 (2d Cir., 1999), *cert. denied*, 529 U.S. 1098 (2000). In doing so, the Court resolves all ambiguities and draws all factual inferences in plaintiff's favor as the non-moving party. <u>Thevenin v. French</u>, 850 Fed. Appx. 32, 34 (2d Cir. 2021).

### II.    ARGUMENT

The District Court committed reversible error in denying qualified immunity to the Officers as a matter of law. The "material" issues of fact identified by the Decision are not disputes which affect the outcome of the suit under the governing law, and the Officers are entitled to Summary Judgment in that their actions were "objectively reasonable" and did not violate "clearly established law.

The City Defendants are therefore entitled to Summary Judgment based on the material facts viewed in the light most favorable to Plaintiff. <u>Martinez v. Hasper</u>, 21-2975, 2023 WL 4417355, at *2 (2d Cir. July 10, 2023).  The City Defendants' Motion should have been granted in its entirety and we respectfully request that the court reverse and dismiss the Complaint.

**A. The District Court incorrectly found "material" issues of fact.**

"[A] district court's mere assertion that disputed factual issues exist [is not independently sufficient] to preclude an immediate appeal." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). Even where a court finds material disputes of fact preclude summary judgment on qualified immunity, an interlocutory appeal is still appropriate where a defendant contests the existence of a dispute or the materiality of such facts, or where a defendant claims entitlement to qualified immunity under a plaintiff's version of the facts. *See,* Cowan v. Breen, 352 F.3d 756 (2d Cir. 2003).

It has also been held that, "[i]n considering such appeals, [the court] may exercise pendent jurisdiction over issues that are not ordinarily subject to interlocutory review whenever (1) they are 'inextricably intertwined' with the determination of qualified immunity or (2) their resolution is 'necessary to ensure meaningful review' of the district court's ruling on qualified immunity." Savino v. City of New York, 331 F.3d 63, 71-72 (2d Cir. 2003).

The Second Circuit has repeatedly stated that in excessive force cases the qualified immunity and Fourth Amendment analyses often "converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." Cowan, 352 F.3d at 764 n.7. In other words, the answer to either the qualified immunity or the Fourth Amendment question often resolves the other. *Id.*

While traditionally a multi-part inquiry, courts are no longer required to address both components of qualified immunity analysis in any specific order. Pearson v. Callahan, 555 U.S. 223 (2009); Francis v. Fiacco, 942 F3d. 126 (2d Cir. 2019). Rather, a court faced with a question of qualified immunity must find that a defendant is entitled to qualified immunity upon a negative answer to any of the following questions: (1) Has the plaintiff alleged a violation of a federally protected right? (2) Was the application of that right to the circumstances at issue clearly established at the time of the conduct? (3) Would an objectively reasonable officer have known that his conduct amounted to such a violation?" Naumovski v. Norris, 934 F.3d 200, 211 (2d Cir. 2019).

As to the first question, use of force by a law enforcement officer is valid under the Constitution if it was 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989).

The reasonableness is "'judged from the perspective of a reasonable officer on the scene and the Supreme Court has identified a non-exhaustive list of factors to consider: (1) 'the severity of the crime at issue;' (2) the degree to which 'the suspect poses an immediate threat to the safety of the officers or others;' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.' Graham, 490 U.S. at 396; Finnegan v. Fountain, 915 F.2d 817 (2d Cir. 1990)

Moreover, "[w]here [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Tenn. v. Garner, 471 U.S. 1, 11 (1985); Martinez, 21-2975, 2023 WL 4417355, at *2 ("No clearly established law required [officer] to wait for actual injuries to occur before firing his weapon"). Applying these standards to our case, assuming the facts in the light most favorable to the Plaintiff, the City Defendants were entitled to summary judgment. Salim v. Proulx, 93 F.3d 86 (2d Cir. 1996).

Rossy had driven away from a traffic stop with a police officer hanging out of his car. Officer Acquino had been seriously injured during these actions, and Officer Tedesco was aware of those injuries. Timothy Blake had almost been run over by Rossy's vehicle. The vehicle then crashed into a stopped police car and an occupied residential home. Rossy fought with Officer Tedesco to avoid capture, refused at least three commands to "get down" before he broke loose, and began to run away in a crowded residential area. Plaintiff alleges that Rossy was "pistol whipped" and video depicts an armed struggle in which Officer Tedesco was holding a gun, so there is no dispute that Decedent knew that Officer Tedesco had drawn his weapon, and was running away despite that fact. Based on these facts, viewed in the light most favorable to Plaintiff, the Officers are entitled to judgment as a matter of law because it was "objectively reasonable" for Officer Tedesco to use deadly force.

Rossy was a threat to the Officers and the numerous civilian witnesses in the area and deadly force was used to prevent his escape. Unlike many of the cases where this court has found summary judgment warranted on a mere possibility, this threat was not of a hypothetical nature, Rossy had actually just caused an injury.

The Officers use of force was therefore justified regardless of whether Rossy had a gun, regardless of whether the Officers knew who Rossy was, and more importantly, even assuming that they did know him and knew that he didn't have a gun. Graham, 490 U.S. at 397 ("officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."); Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018)(standard is an objective one, "asking not whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position.")

While these are clearly disputed issues, for the purposes of this Appeal, Plaintiffs can argue or impute whatever intent they wish as to the Officers and prior interactions with the Rossy, and their intentions or motivations, but the reasonableness standard in this context is an "objective" one, "without regard to [the officers] underlying intent or motivation", so it is not material to determination of the City Defendants Motion or this appeal. Graham, 490 U.S. at 397.

Additionally, an officer's actions leading up to the application of force are irrelevant to the question of objective reasonableness. Fortunati v. Campagne, 681 F.Supp 2d 528 (D. Vt., 2009), *affd sub nom*. Fortunati v. Vermont, 503 Fed Appx 78 (2d Cir. 2012), *as amended* (Dec. 3, 2012), *compare with*, Mullenix v. Luna, 577 US 7, 13 (2015)(where officers "confronted a reportedly intoxicated fugitive, set on avoiding capture …")

As to the Court's Decision, whether or not the Officers had probable cause to arrest, and assuming the cause of Officer's Acquino's injury was something other than a gun shot, are not "material" issues facts to Officer Tedesco's ultimate decision to use deadly force. These two issues identified do not lead to a different result under the "objective reasonableness" test, regardless of which light they are viewed, the Plaintiffs therefore did not establish a constitutional violation under their version of events. [Dkt. 142, p. 17-20].

To begin with, it has been specifically and repeatedly held that a lack of probable cause  for an arrest does not establish an excessive-force claim. Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006); County of Los Angeles v. Mendez, 581 U.S. 420 (2017); Ivery v. Baldauf, 284 F.Supp 3d 426, 437 (W.D.N.Y. 2018); Whren v. United States, 517 U.S. 806 (1996)(Constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved).

Moreover, the cause of injury is immaterial for at least three reasons. First, whether or not Plaintiff actually had a gun is not material or dispositive to this case. Officer Tedesco had facts and circumstances sufficient for him to reasonably believe that Rossy did have a gun. Officer Tedesco testified that he believed Officer Acquino had been shot. There is no question that Officer Acquino was injured. Numerous other individuals believed Officer Acquino had been shot. Ford v. Childers, 855 F.2d 1271, 1275-76 (7th Cir. 1988)("Even though [Officer] did not actually see a weapon in the suspect's hand (a post obstructed his view of the suspect's hand), given the information he possessed at that particular time and the observations he made, Childers reasonably concluded that the suspect was armed and dangerous. As we recognized in another § 1983 action concerning a police shooting, a reasonable belief that danger exists may be formed by reliance on appearances. And as we noted today, 'no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts.'")

Plaintiff obviously disputes that Rossy had a gun, but the law is clear that when the threat towards the officer is from a gun, he does not have to wait for the individual to shoot first, or even point the weapon at him. Rose v. City of Utica, 14 CV 1286 (BKS)(TWD) 2018 U.S. Dist. LEXIS 220803 *33 (N.D.N.Y. April 19, 2018)(no need for police to wait for an active shooter to shoot first); Phillips v. Middletown, 17 CV 5307 (CS) 2018 U.S. Dist. LEXIS 163308 *14 n 4 (S.D.N.Y.

September 9, 2018); <u>Ridgeway v. City of Syracuse</u>, 16 CV 618 (GTS)(ATB) 2019 U.S. Dist. LEXIS 16003 *35 n 10 (N.D.N.Y. February 1, 2019); <u>Scott v. City of Rochester</u>, 17-CV-6311-FPG, 2019 WL 4016165, at *5 (W.D.N.Y. Aug. 26, 2019)("Obviously, Scott disputes that he was *in fact* such a threat, but a potential suspect's subjective intentions do not govern the use-of-force analysis. That is why an officer's reasonable but mistaken belief about the threat a suspect poses can justify the use of force notwithstanding the suspect's subjective intent."); *see also*, <u>Stephenson v. Doe</u>, 332 F.3d 68, 78-79 (2d Cir. 2003). Thus, whether Officer Tedesco actually observed the gun is immaterial.

Respectfully, while we understand Plaintiff may claim otherwise, and we recognize that we must accept the facts the evidence viewed in the light most favorable to Plaintiff, we submit that the evidence does not actually raise a genuine question of fact as to whether Officer Tedesco believed that Acquino had been shot. <u>Tierney v. Davidson</u>, 133 F.3d 189 (2d Cir. 1998)("district court erred in concluding that a genuine dispute existed"). While there may be an issue as to whether Rossy had a gun, or if Acquino had actually been shot, there is no such material question as to what Tedesco reasonably believed. <u>Davis v. Little</u>, 851 F.2d 605 (2d Cir. 1988)(Court "correct in looking at the circumstances as a person in [defendant's] shoes saw them, as opposed to considering all the information that all the other officers possessed, in determining whether [defendants'] conduct was reasonable").

Here, the record is replete with uncontradicted witness testimony and records, including the 911 calls, demonstrating that Officer Acquino said he had been shot. It was not only Acquino who believed that he had been shot, Tedesco himself did, and more importantly so did several other civilian witnesses. Moreover, there is no question that he was bleeding, no question that his ear was hanging from the side of his head, and no question that he was in obvious distress. There is also no obvious other cause of the injury which would render some other conclusion unreasonable.

Plaintiff's claim Tedesco did not believe Acquino had been shot is based largely on Emmanuel Ortiz's testimony that he did not hear Officer Acquino say that he had been shot. That alone does not create a question of fact, as he did not testify that it wasn't said, and he was not in a position to see or hear much of the struggle. On this point, among others, it is worth emphasizing that, unlike O'Bert ex rel. Estate of O'Bert, 331 F.3d 29, 37 (2d Cir. 2003) (internal citations omitted), this was not an otherwise unwitnessed incident, and there are numerous witnesses, audio recordings, and videos that provide the Court with accounts of the relevant events.

Again, the City Defendants are proceeding on the Plaintiff's asserted facts under the "objective reasonableness" standard. Moreover, Officer Tedesco testified and acknowledged that he did not see a gun in Rossy's hands, this was not the basis for his decision. [107-6, p. 214]. He also gave a statement that "I heard a loud bang but I couldn't differentiate if it was the car hitting the house, the gunshot, what it

was". [Dkt. No. 107-7]. He did not claim that "at any point while you were struggling with him [that] he felt a weapon on him or…anything that…[he] may have thought was a weapon". [Dkt. No. 107-7]. Officer Tedesco did not need to testify to these things to establish justification, it was "objectively reasonable" for an officer to do so, and any arguments or claims made with respect to motivations are feigned issues and not material for the application of law to the facts of this case.

Second, even assuming there is a question of fact as to whether Officer Tedesco believed that Acquino had been shot, or that Rossy possessed a gun, the use of force would still be justified as "objectively reasonable" and at the very least protected by qualified immunity regardless of the cause of the injury. Plumhoff v. Rickard, 572 U.S. 765, 765 (2014). This is because there is no question that the injury occurred, there is no question that the injury had something to do with Rossy's actions during the operation of his motor vehicle, there is no question that the injury was "serious", and there is no question that Officer Tedesco observed that injury. Moreover, there is no question that the vehicle almost hit Timothy Blake.

The case law does not require that a weapon be present to justify the use of deadly force, or that the threat of serious physical harm be caused by such a weapon. In fact, Garner, 471 U.S. 1, 11-12, makes clear that a weapon is not necessary, in that there are essentially two justifications, where "the suspect threatens the officer with a weapon **or** there is probable cause to believe that he has committed a crime

involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. (*emphasis added*); *see also*, <u>Billingsley v. City of Omaha</u>, 277 F3d 990, 995 (8th Cir. 2002)(Although decedent was found to be unarmed, a police officer can still employ deadly force if objectively reasonable); <u>Ryder v. City of Topeka</u>, 814 F.2d 1412, 1419 n. 16 (10th Cir.1987)(Concluding that, because a requirement that a suspect actually have a weapon would place police in "a dangerous and unreasonable situation ... whether a particular seizure is reasonable is dependent on the 'totality of the circumstances,' and not simply on whether the suspect was actually armed").

The lack of a "weapon" is outlined clearly in the Supreme Court's line of cases analyzing car chases and, again, turning back to the factors outlined by the Supreme Court, the severity of the crime committed was the nearly killing an officer and civilian with a vehicle, the immediacy of the threat was demonstrated by the fact that he had just crashed into a occupied residential home in a crowded neighborhood, and Rossy's clear demonstration that he was actively resisting arrest or attempting to evade arrest by flight by immediately struggling with Officer Tedesco. <u>Graham</u>, 490 U.S. at 396. There is no requirement for a "weapon". <u>Scott v. Harris</u>, 550 U.S. 372, 382 (2007)("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'")

Third, Officer Tedesco's use of force would still have been objectively reasonable even if Officer Aquino's ear had not been injured, therefore the cause of that injury is not material to the determination of this case. While it is not disputed, even assuming *arguendo* that the injury did not occur, the undisputed facts still establish that Rossy had driven his vehicle with Officer Aquino hanging out the door, almost struck Timothy Best, had "scuffled" with Officer Acquino to avoid arrest, and was running away. Kisela v. Hughes, 138 S.Ct. 1148, 1151 (2018)

In Sykes v. United States, 564 U.S. 1 (2011), *overruled on other grounds by* Johnson v. United States, 576 U.S. 591 (2015), the Supreme Court held that felony flight in a vehicle is a "dangerous felony". The Court elaborated, in language fully applicable to this case: "Because an accepted way to restrain a driver who poses dangers to others is through seizure, officers pursuing fleeing drivers may deem themselves duty bound to escalate their response to ensure the felon is apprehended."

As the Court further acknowledged: "once the pursued vehicle is stopped, it is sometimes necessary for officers to approach with guns drawn to effect arrest. Confrontation with police is the expected result of vehicle flight. It places property and persons at serious risk of injury." Sykes, 564 U.S. at 10. The Court referred to statistics of police reports involving vehicular flight and said: "Although statistics are not dispositive, here they confirm the commonsense conclusion that Indiana's vehicular flight crime is a violent felony.'" Sykes, 564 U.S. at 10.

Similarly, in <u>Scott v. Harris</u>, 550 U.S. 372, 385 (2007), the Supreme Court rejected the possibility that police could eliminate the danger from a vehicle flight by giving up the chase because the perpetrator "might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow." Therefore, vehicular flight involves a dangerous felony as a matter of law and "the intervening pursuit creates high risks of crashes."

Regarding the physical altercation between the Officer and Rossy, there is no question that this altercation happened and there is no question that Rossy did not "give up" or "fully surrendered" <u>Hemphill v. Schott</u>, 141 F.3d 412, 417 (2d Cir. 1998); (holding that officers "alleged decision to use potentially deadly force upon a suspect who stopped and raised his arms in the air when commanded to do so does not qualify as reasonable," despite "extremely violent" crimes).

That altercation can be described in whatever manner Plaintiff chooses, but under any account in the record, there is no material issue of fact created for the purposes of this Motion . <u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004)(It was not clearly established in particularized sense that police officer violated Fourth Amendment's deadly-force standards by shooting disturbed suspect who was subject to felony no-bail warrant and who fled from officer in vehicle, and thus officer was entitled to qualified immunity in suspect's §1983 excessive-force action against officer; persons in immediate area were at risk from flight, and suspect had demonstrated

that he would do almost anything to avoid capture, since he started and accelerated vehicle even after officer had ordered him from it at gunpoint, had broken driver's-side window, and had struck suspect in head with weapon…"Unlike most 'excessive force' cases in which the degree of permissible force varies widely from case to case, the only issue in a 'deadly force' case is whether the facts apparent to the officer justify a decision to kill a suspect in order to prevent his escape.")

The City Defendants not disputing this altercation, and it serves as a basis and explanation for the eventual use of deadly force. The Plaintiff resisted, Officer Tedesco told him to "get down" at least three times, and the Plaintiff got loose and fled. These facts are not disputed. The witnesses, video, statements, testimony, and physical evidence all demonstrate that there was a physical struggle between the officers and the Decedent. This struggle followed Decedent's car almost striking a child on a bike and crashing into a home, after Officer Acquino's ear was almost ripped off. That the Plaintiff's jacket was pulled over his head, and the particular methods that the Decedent used to struggle with the Officers is not material, as there is simply no dispute that "he was fighting back". (Dkt. 106-15). Elias v. Vil. of Spring Val., 81 F Supp 3d 312 (S.D.N.Y. 2015). It is well established that Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance.

*See* Mecham v. Frazier, 500 F.3d 1200, 1205 (10th Cir. 2007); Wertish v. Krueger, 433 F.3d 1062 (8th Cir. 2006).

Additionally, while not specifically addressed by the District Court, any reference to or disagreement about the Plaintiff's interpretation of the Manual of Procedures is immaterial to the City Defendants' Motion. Brown v. City of New York, 862 F.3d 182, 192 (2d Cir. 2017)(affirming grant of qualified immunity even though officer's conduct violated the New York Police Department Patrol Guide)

As this Court held in Martinez v. Hasper, 21-2975, 2023 WL 4417355, at *3 (2d Cir. July 10, 2023), "the Patrol Guide policy…in no way alters the constitutional standard for the use of deadly force, which requires only that the officer have 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'". *See also*, Virginia v. Moore, 553 U.S. 164, 172 (2008)("We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices…"), *citing to* Whren v. United States, 517 U.S. 806 (1996)(holding that police officers acted reasonably in stopping a car, even though their action violated police department regulations limiting the authority of plainclothes officers in unmarked vehicles); Sullivan v. Metro. Transit Auth. Police Dept., 2017 WL 4326058, *4 (S.D.N.Y. 2017)("a violation of [police] procedure is not probative of whether the Constitution has been violated"); Townes v. City of New York, 176 F.3d 138 (2d Cir. 1999); Roguz v. Walsh, 09-1052 TLM,

2013 WL 1498126, at *8 (D Conn Apr. 5, 2013)("the City's policies are not a substitute for a constitutional standard and that violation of or compliance with the City's policies cannot replace the Fourth Amendment inquiry.")

The City Defendants have thus assumed the facts in the light most favorable to Plaintiff, as they must, but that does not require every witness to have exactly the same memory or perception of events from years ago, particularly given that "police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving".  Graham, 490 U.S. at 386.

While there may be slightly different versions or interpretations in the numerous witness statements, those facts are not "material" under the applicable legal standards in the Second Circuit because they do not have effect on the outcome of the suit under either the "excessive force" or "qualified immunity" analysis. Kisela v. Hughes, 138 S.Ct 1148, 1151 (2018); Fortunati v. Campagne, 681 F. Supp. 2d 528, 537–38 (D. Vt. 2009), aff'd sub nom. Fortunati v. Vermont, 503 F. App'x 78 (2d Cir. 2012); Estate of Jaquez v. City of New York, 104 F Supp 3d 414, 419-20 (S.D.N.Y. 2015), aff'd sub nom. Estate of Jaquez by Pub. Adm'r of Bronx County v. City of New York, 706 Fed Appx 709 (2d Cir. 2017)("Critically, plaintiffs lack evidence to counter the officers' description of what occurred: their sole expert— who proposed to testify to, inter alia, Jaquez's psychological state, law enforcement techniques, ballistics, and forensic pathology - has been precluded. Plaintiffs'

42

reliance on pure speculation and minor inconsistencies in defendants' testimony does not create a triable issue of fact on the reasonableness of force used throughout most of the event).

Officer Tedesco had no obligation to wait for further injury or Rossy injured someone else before using lethal force. *See*, San Francisco v. Sheehan, 575 U.S. 600. Decedent's actions forced Officer Tedesco to make a split-second decision when faced with a fleeing felon who had actually caused serious physical injury and who had demonstrated that he would do anything to avoid capture. Under these circumstances, the Officer acted reasonably when he fired.

Based on the application of these standards to the facts alleged by the Plaintiffs, the alleged issues of fact were not "material" to the "objective reasonableness" of the Officers conduct. Police officers will fail the objective reasonableness test only if their conduct was "so deficient that no reasonable officer could have made the same choice" in those circumstances. Cerbelli v. City of New York, 99-CV-6846 ARR RML, 2008 WL 4449634, at *6 (E.D.N.Y. Oct. 1, 2008). That is simply not the case here, and there is no material evidence to the contrary.

**B. The use of force did not violate "clearly established law".**

Qualified immunity is intended to shield public officials from the burden and expense of participating in litigation, so it is imperative that the issue is resolved at the earliest possible stage. Seidman v. Colby, No. 1:18-CV-202 (TJM/CFH), 2021 U.S. Dist. LEXIS 228706, at *15 (N.D.N.Y. Nov. 30, 2021).

In order for qualified immunity to be unavailable, existing precedent must have placed the illegality of the officer's conduct "beyond debate." Plumhoff v. Rickard, 572 U.S. 765, 768 (2014)("police officers who shot the driver of a fleeing vehicle to put an end to a dangerous car chase."). White v. Pauly, 580 U.S. 73, 80 (2017)("in the light of pre-existing law the unlawfulness must be apparent").

As the Supreme Court noted in Mullenix, 577 US at 14 (2015) "excessive force cases involving car chases reveal the hazy legal backdrop against which [officers act]." Explaining existing Supreme Court precedent in connection with drivers who flee from police in Mullenix, 136 S.Ct. at 310, "The Court has . . . never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity".

To the extent that Plaintiff's argue that the particular facts of this case do not fall exactly in line with the "car chase" cases, they offer no case in support of that distinction, and the application of qualified immunity analysis set forth below, still warrants dismissal of the Complaint as there is no apparent unlawful distinction.

44

Qualified immunity applies "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' or 'insofar as it was objectively reasonable for them to believe that their acts did not violate those rights.' " Golino v. New Haven, 950 F.2d 864, 870 (2d Cir. 1991). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Mullenix, 577 U.S. at 11 (internal citations omitted).

The Supreme Court "ha[s] repeatedly told courts . . . not to define clearly established law at a high level of generality." Mullenix, 577 U.S. at 12. In White v. Pauly, 137 S. Ct. 548, 552 (2017), the Court made clear that qualified immunity can only be denied if a case is identified "where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment."

The particularity of conduct being clearly established "is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix, 136 S. Ct. 305 (2015)(internal citations and quotation omitted); *see also* Brosseau, 543 U.S. at 198(holding "[qu]alified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force.")(citations omitted) (internal quotations omitted); s*ee also*, Saucier, 533 U.S. at 205.

45

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." <u>Kisela</u>, 138 S. Ct. 1153. In the context of excessive force, general reliance on the proposition that deadly force requires a sufficient threat is insufficient as a matter of law to resolve the issue of qualified immunity. *See id.*

"In determining whether a right was so clearly established, the Supreme Court has emphasized that the "dispositive inquiry . . . is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted*.'" <u>Barboza v. D'Agata</u>, 676 Fed. Appx. 9, 12 (2d Cir. 2017)(emphasis in original); *citing* <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001)).

"The Second Circuit has found three factors relevant to this inquiry: (1) the right in question should be defined with "reasonable specificity," (2) Supreme Court and Second Circuit decisions support the existence of the right in question, and (3) a reasonable defendant would understand that their conduct is unlawful under existing law." <u>Shechter v. Comptroller of the City of New York</u>, 79 F.3d 265, 271 (2d Cir. 1996)).

In <u>Gonzalez v. City of Schenectady</u>, 728 F.3d 149, 162 (2d Cir. 2013), this Court recognized the many "permutations of fact" that can bear on the constitutionality of an officer's conduct and the high bar that must be met to find

that the law was clearly established at the time of the violation: "[t]he policeman is not expected to know all of our precedents or those of the Supreme Court, or to distinguish holding from dicta, or to put together precedents for line-drawing, or to discern trends or follow doctrinal trajectories. Otherwise, qualified immunity would be available only to a cop who is a professor of criminal procedure in her spare time."

Here, it is worth noting and even visualizing the scene of events laid out by Plaintiff's version of facts which were escalating before Officer Tedesco. A suspect's car had sped off with his partner inside of it. The car had just nearly run over a fourth grader and was now parked on a house after crashing through signs and bushes. His partner's ear was now hanging from the side of his head. His gun was drawn during a fight, and Rossy had was running away, with every reasonable inference telling the officer that he was not going to stop, and all the other individuals in the area. These are the "permutations of fact" which were confronting Officer Tedesco during actual violence and physical struggle. These were the "permutations of fact" that the Plaintiff would have the Officer interpret and process in light of the existing Fourth Amendment case law as interpreted by the higher Courts in this circuit, weighing each possible distinction in an attempt to guess on where the Court would land on this unrepeatable set of facts. This is simply not the analysis demanded by the Supreme Court. There was a heightened threat established by undisputed facts, it cannot be said to be unreasonable to do what he did.

While *Garner* and *Graham* establish general propositions of law, the Supreme Court has held that "*Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" White, 580 U.S. at 80 ("This is not a case where it is obvious that there was a violation of clearly established law…the majority did not conclude that White's conduct—such as his failure to shout a warning—constituted a run-of-the-mill Fourth Amendment violation.").

Instead, Plaintiff must be able to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. We submit that there simply is no such case with respect to the particular facts here. *See*, Strong v. Gorman, 310 F.Supp. 3d 380 (W.D.N.Y. 2018)("it seems self-evident that the defendants' use of force was reasonable" where officers' use of deadly force in opening fire on murder suspect, while he was allegedly cornered and unarmed, was objectively reasonable, thus precluding suspect's excessive force claim against them, where they had chased down suspect, who led them on a high-speed chase through city streets, who had fired at and hit a police officer, who continued to flee after he was himself hit by bullets, and who refused to surrender when cornered.)

More importantly, putting aside the lack of an decision on point, there is no established right that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' To the contrary, the existing case law would lead reasonable officers to believe their use of force was justified.

48

To this point, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231. "This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." San Francisco v. Sheehan, 135 S. Ct. 1765 (2015), *quoting* Heien v. North Carolina, 135 S.Ct. 530, 536 (2014). This is so because "[t]he Constitution is not blind to the fact that police officers are often forced to make split-second judgments." Sheehan, 135 S.Ct. at 1775, *quoting* Plumhoff, 134 S.Ct. at 2020. The reasonableness standard allows for some mistakes on the part of officers, affording them "fair leeway" while enforcing the law. Heien, 135 S. Ct. at 536. "The limit is that the mistakes must be those of reasonable men." Id.

In Brosseau, which also involved the shooting of a suspect fleeing by car, the Ninth Circuit denied qualified immunity on the ground that the officer had violated the clearly established rule, set forth in Garner, that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Haugen v. Brosseau, 339 F.3d 857, 873 (C.A.9 2003) (internal quotation marks omitted).

The Supreme Court reversed, holding that use of Garner's " general" test for excessive force was "mistaken." Brosseau, 543 U.S., at 199. The correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment

prohibited the officer's conduct in the "'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.,* at 199–200.

In <u>Thevenin v. French</u>, 850 Fed. Appx 32, 35 (2d Cir. 2021), this Court held "[a]s an initial matter, at the time of the incident at issue, it was clearly established law in this Circuit, as articulated in *Cowan ex rel. Estate of Cooper v. Breen* in 2003, that "'it is not objectively reasonable for an officer to use deadly force to apprehend a [fleeing motorist] unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"

These cases are not factually similar because they involve individuals who did not pose a threat to serious physical injury. As set forth above, these cases cannot provide the required notice because Rossy actually posed a significant threat of death or serious physical injury to the officers and others. This was not an isolated low-speed chase with disputes over who was standing where. Rossy had caused a serious physical injury, and threatened more by taking off in his vehicle, nearly running over someone else, and crashing into a residential home. These facts are not in dispute, even assuming Plaintiff's version. In fact, the actual physical harm in our case (let alone the threat of more harm) was as great or greater than any of the Supreme Court's "car chase" cases. This was not a light collision with a barrier, this was an ear hanging from the side of a head, threatening to get worse.

This Court's reasoning for not applying the line of car chase cases in Thevenin is not applicable in this case, specifically in that "In each of these Supreme Court cases, and numerous other cases cited by defendant, the critical fact that allowed qualified immunity to attach to the use of deadly force by police officers was the presence of a significant threat of death or serious physical injury to either the defendant, other officers, or civilian bystanders. Here, under the version of facts most favorable to plaintiff, that critical fact is completely absent….when viewing the facts in the light most favorable to plaintiff, French was plainly unjustified in using deadly force against Thevenin because, simply put, no one was in danger." Thevenin, 850 Fed Appx at 37.

Extending that same reasoning would not be appropriate here because it would ignore the fact, not only that there was actual serious physical injury, but that Rossy continued to pose such a threat after getting out of the vehicle by fighting with an armed officer, refusing commands to "get down", breaking free and clearly demonstrating that he was not going to stop. Even drawing all inferences in favor of the Plaintiff, the fact remains that Officer Tedesco reasonably believed that the Plaintiff was and continued to be a threat. The cell phone video provides uncontroverted evidence that he was commanding Plaintiff to "get down", and Rossy was resisting, prior to shots being fired. Rossy did not have to possess a gun to pose a threat of serious injury at the time Tedesco discharged his weapon.

For these same reasons the cases where a suspect, "gives up" or has nowhere else to go, or even where no warning is provided, are not applicable here. There is no evidence or allegation that Rossy was "giving up". Moreover, the Court's focus on those facts would lead a reasonable officer to think that where a suspect is clearly not "giving up", has not "fully surrendered" and continues to physically struggle and attempt to escape, the use of force is warranted, or at the very least the prohibition is not clearly defined. Hemphill v. Schott, 141 F.3d 412, 417 (2d Cir. 1998); Bah v. City of New York, 319 F Supp 3d 698, 710-11 (S.D.N.Y. 2018)(The fact that the person may have engaged in some form of threatening conduct in the moments before the shooting would not justify shooting him after he ceased posing a threat…"[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting *until the threat has ended*." (emphasis added); *compare*, Estate of Jaquez v. City of New York, 104 F.Supp.3d 414 (S.D.N.Y. 2015)(granting summary judgment on all uses of force except final shot while the individual was on ground).

As this Court held in Carvajal v. Mihalek, 453 Fed Appx 69, 72 (2d Cir. 2011), "we are not persuaded by Carvajal's argument that no reasonable jury could have concluded that a warning was not feasible before shots were fired. First, Carvajal's contention rests on a false premise that no warning was given. In fact, when police entered the apartment…armed officers repeatedly warned…to "get down," which

they disobeyed. Assuming *arguendo* that a further warning was required, a reasonable jury could have found that such a warning was not feasible in light of the rapidly evolving scenario..." (internal citation omitted)

The Supreme Court's decision in <u>Kisela</u>, 138 S. Ct. at 1153 is illustrative of an officer who, acting under circumstances with far less reason to believe that an individual was a threat to serious physical injury, was found to have not violated clearly established law. In <u>Kisela</u>, the Supreme Court granted qualified immunity to an officer who responded to a radio report that a woman was acting erratically while holding a large knife. When the officers arrived at the scene, they saw the plaintiff, who matched the description from the radio report, as she was holding a knife and about to take a step towards a woman who was approximately six feet away.

Believing the woman was in danger, the officers, who were separated from the women by a chain link fence, made repeated commands to the plaintiff to drop the weapon. When the plaintiff refused to comply, the defendant officer shot the plaintiff four times. Less than a minute had elapsed from the moment the officers saw the plaintiff move to the time that the defendant officer fired shots. *Id.* at 1151.

These facts do not come close to the actual serious injury and threats at issue in our case. Respectfully, there is no "reasonable officer" who would read the facts of <u>Kisela</u> and interpret it to mean anything other than the Supreme Court saying that use of deadly force was warranted given what Officer Tedesco was facing. *See also*,

53

O'Brien v. Barrows, 556 Fed Appx 2, 4 (2d Cir. 2014)("The district court found that such an apparent threat existed in this case…'")

Similarly, in Scott v. City of Rochester, No. 17-CV-6311 (FPG), 2019 U.S. Dist. LEXIS 144452, at *9 (W.D.N.Y. Aug. 23, 2019), an officer was granted qualified immunity because, like in Kisela, existing precedent did not squarely govern the facts at issue in the case. There the record, as viewed in the light most favorable to the Plaintiff, showed the officers believed that suspect had been involved in a domestic dispute and they observed a minivan that did not stop when police turned on their lights and sirens. Plaintiff then jumped out of his vehicle to run away, one police officer yelled "he's got a gun"; Plaintiff did not comply with police orders to "Freeze" and "Stop". Plaintiff then hid for cover behind the minivan, yelling "Don't shoot me" and lunged from cover to continue fleeing from police. The Court found the shooting justified despite the fact that Plaintiff had yelled, "don't shoot me" while taking cover, which obviously did not occur here.

In granting qualified immunity, the Court noted "existing precedent does not place the constitutional question beyond debate. Indeed, after surveying the case law, one court held that "in most of the cases where a fleeing suspect possessed a firearm, courts have found officer shootings to be reasonable.' " Id. at *12. After reviewing cases from various circuits, the court properly noted that while "[t]hese cases all

have their own factual nuances . . .at the very least they demonstrate that the constitutional question presented here…is unsettled." *Id.* at *13.

Finally, while not necessary because of the other arguments above, if this Court finds that Officer Tedesco reasonably believed that Rossy had a gun, Officer Tedesco has the ability to be wrong in his perception. He does not need to wait for the threat to materialize. N. S., only child of decedent Stokes v. Kansas City Bd. of Police Commissioners, 143 S.Ct 2422 (2023)("It is true that there are some differences here….Despite these differences, a reasonable officer …might not have known for certain that [his] conduct was unlawful,'…")

For all these reasons, if one could debate whether it was "objectively reasonable" for Officer Tedesco to use deadly force under these circumstances, even assuming the facts in the light most favorable to the Plaintiff, existing precedent does not place the constitutional question "beyond debate". Savage v. City of Memphis, 620 F. App'x 425, 428 (6th Cir. 2015); Aswell v. Culpepper, No. 12-CV-997, 2015 WL 1638094, at *5 (E.D. La. Apr. 13, 2015)(use of deadly force was objectively reasonable where suspect of armed robbery fled from police by car and then by foot); Davis v. McCarter, 569 F. Supp. 2d 1201 (D. Kan. 2008)(objectively reasonable to use deadly force to apprehend fleeing suspect had taken police on car chase; ran on foot through a residential neighborhood; refused to stop at police commands); Thompson v. Hubbard, 257 F.3d 896 (8th Cir. 2001); Ford v. Childers,

855 F.2d 1271 (7th Cir. 1988)(use of deadly force reasonable where continued to flee despite police yelling "Halt"); <u>Billingsley v. City of Omaha</u>, 277 F.3d 990 (8th Cir. 2002)(suspect was eventually discovered to be unarmed, the officer still believed that the suspect posed a risk of death or serious bodily injury);

## CONCLUSION

Neither the Court nor Plaintiff pointed to any controlling case from the United State Supreme Court, or the Second Circuit, which establishes that Officer Tedesco's actions were unlawful "beyond debate". The District Court's Decision and Order should be reversed, in part, and Summary Judgment be granted in favor the City Defendants on the grounds of qualified immunity on Plaintiffs' Fist Cause of Action.

Dated:  January 24, 2024
      Buffalo, New York

                                    CAVETTE A. CHAMBERS, ESQ.
                                      Corporation Counsel


                                      */s/ Robert E. Quinn*
                                      By:  Robert E. Quinn
                                      Assistant Corporation Counsel

## CERTIFICATE OF COMPLIANCE

The Law Department of the City of Buffalo hereby certifies that this Defendant-Appellants' Brief contain 12,882 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2013 in Times New Roman, 14 point.


Dated: January 24, 2024
      Buffalo, New York

CAVETTE A. CHAMBERS, ESQ.
Corporation Counsel


*/s/ Robert E. Quinn*
By: Robert E. Quinn
Assistant Corporation Counsel