# 23-7296-cv(L),
## 23-7368-cv(XAP)

# United States Court of Appeals
### *for the*
# Second Circuit

MARGARITA ROSSY, as Administrator of the Estate of Jose Hernandez-Rossy,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

CITY OF BUFFALO, AND ITS AGENTS, SERVANTS AND EMPLOYEES,
JUSTIN TEDESCO, BUFFALO POLICE DEPARTMENT P.O.,
JOSEPH ACQUINO, BUFFALO POLICE DEPARTMENT P.O.,
POLICE COMMISSIONER DANIEL DERENDA, Individually
and in their representative capacities,

*Defendants-Appellants-Cross-Appellees,*

AMERICAN MEDICAL RESPONSE, AND ITS AGENTS, SERVANTS
AND EMPLOYEES DBA AMR,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## FINAL FORM BRIEF FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT

LAW OFFICE OF NELSON S. TORRE
Nelson Torre, Esq.
*Attorneys for Plaintiff-Appellee-Cross-Appellant*
438 Main Street, Suite 910
Buffalo, New York 14202
(716) 854-2808
bflolawyer@aol.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ................................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 7

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 7

STATEMENT OF THE CASE ..................................................................... 8

    I.     Procedural History .......................................................... 8

    II.    Statement of Facts............................................................ 9

          A.    *The Events leading up to the Shooting* ..................... 10

          B.    *The Fatal Shooting* .................................................. 16

          C.    *The Defendants' Cover Up Began as the Events Unfolded*...... 19

THE DISTRICT COURT'S DECISION & ORDER .......................................... 28

SUMMARY OF ARGUMENT.................................................................... 29

STANDARD OF REVIEW ......................................................................... 33

POINT I    THE COURT LACKS JURISDICTION TO HEAR THIS APPEAL ................................................................... 33

    A.    The District Court found Material Issues of Fact on the Qualified Immunity Defense ....................................... 33

    B.    City Defendants Have No Qualified Immunity Defense ................... 36

POINT II    DISTRICT COURT PROPERLY RULED THAT DEFENDANTS WERE NOT ENTITLED TO QUALIFIED IMMUNITY ................................................... 37

    A.    The Mechanism for Determining Qualified Immunity ...................... 38

i

B.     It Was Clearly Established that Rossy had a Right Not to Be Shot in the Back at Long Range While he was Visibly Unarmed and Posed No Significant Threat of Harm to the Officers or Others ................................................................................ 42

POINT III    INDIVIDUAL LIABILITY AND PUNITIVE DAMAGES CLAIMS AGAINST DEFENDANTS TEDESCO AND ACQUINO SHOULD NOT HAVE BEEN DISMISSED................. 54

POINT IV    CLAIMS FOR OFFICIAL MISCONDUCT AND FABRICATION OF EVIDENCE SHOULD NOT HAVE BEEN DISMISSED. ........................................................... 58

CONCLUSION....................................................................... 61

CERTIFICATE OF COMPLIANCE ...................................... 62

## TABLE OF AUTHORITIES

**CASES**

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113 (2d Circuit 2004)................. 37

Amore v. Novarro, 624 F.3d 522, 529-30 (2d Cir. 2010) ......................................... 39

Ashcroft v. al-Kidd, 563 U.S. 731 (2011) ................................................................ 39

Bolmer v. Oliveira, 594 F.3d 134 (2d Cir. 2010) ........................................ 7, 32, 34

Bouggess v. Mattingly, 482 F.3d 886, 891-92 (6th Cir. 2007) ................................ 41

Brown v. Halpin, 885 F.3d 111, 117 (2d Cir. 2018)................................................. 34

Bryant v. Egan, 890 F.3d 382, 386 (2d Cir. 2018) ................................................... 33

Clubside, Inc. v. Valentin, 468 F.3d 144 (2d Cir. 2006) .......................................... 55

Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015)........................................... 59

Cowan v. Breen, 352 F.3d 756 (2d Cir. 2003) ......................................................... 40

DiMarco v. Rome Hospital, 952 F.2d 661 (2d Cir. 1992) ......................................... 6

District of Columbia v. Wesby, 583 U.S. 48 (2018) ...........................................39, 40

Frierson v. Reinisch, 804 F. App'x. 54 2020 WL 1490884 (2d Cir. 2020).............. 34

Garcia v. Sistarenik, 603 F. App'x 61 (2d Cir. 2015) .............................................. 32

Gibbs v. City of Bridgeport, 2018 U.S. Dist. LEXIS 147506 ................................. 49

Gilmere v Atlanta, 774 F2d 1495 (11th Cir 1985) *cert. denied* 476 U.S. 1115
(1986) .......................................................................................................................47

Golino v. City of New Haven, 950 F.2d 864 (2d Cir. 1991) .................................... 51

Graham v. Connor, 490 U.S. 386 (1989).............................................................42, 47

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ............................................................. 40

Henry v. City of New York, No. 02 Civ. 4824 (JSM), 2003 U.S. Dist. LEXIS 15699,
2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003)............................................60

Hope v. Pelzer, 536 U.S. 730, 741 (2002)................................................................ 39

K.H. v. Morgan, 914 F.2d 846, 851 (C.A.7 1990) .................................................. 47

Kentucky v. Graham, 473 U.S. 159 (1985)............................................................... 37

Kolstad v American Dental Ass'n, 527 U.S. 526 (1999) ......................................... 56

<u>Lennon v. Miller</u>, 66 F.3d 416 (2d Cir. 1995) ........................................................ 42

<u>Malley v. Briggs</u>, 475 U.S. 335 (1986) ................................................................. 49

<u>Manganiello v. City of New York,</u> 612 F.3d 149 (2d Cir. 2010) ............................ 59

<u>Marrero for Estate of Morales v. Cote</u>, 756 F. App'x 79, 80 (2d Cir. 2019) ............. 34

<u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985) ............................................................... 37

<u>Myers v. County of Nassau</u>, 825 F. Supp. 2d 359 (E.D.N.Y. 2011) ....................... 61

<u>New Windsor Volunteer Ambulance Corps., Inc v. Meyers</u>, 442 F.3d 101 (2d Cir. 2006) ............................................................................................................56, 57

<u>O'Bert v. Vargo</u>, 331 F.3d 29 (2d Cir. 2003) ........ 5, 6, 30, 35, 36, 38, 41, 42, 50, 51

<u>Outlaw v. City of Hartford</u>, 884 F.3d 351, 367 (2d Cir. 2018) ................................. 47

<u>Pearson v. Callahan</u>, 555 U.S. 223 (2009) ............................................................. 40

<u>Plumhoff v. Rickard</u>, 572 U.S. 765 (2014) ........................................................34, 35

<u>Pollard v. New York Methodist Hosp.</u>, 861 F.3d 374 (2d Cir. 2017) ...................... 37

<u>Pourkavoos v. Town of Avon</u>, 823 F. App'x 53 (2d Cir. 2020) ............................. 51

<u>Pub. Adm'r v. City of N.Y.</u>, 2009 U.S. Dist. LEXIS 18350 (S.D.N.Y.) ................. 44

<u>Rasanen v. Doe</u>, 723 F.3d 325 (2d Cir. 2013) ........................................ 30, 35, 37, 41

<u>Reichle v. Howards</u>, 566 U.S. 658 (2012) .............................................................. 39

<u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123 (2d Cir. 1997) ..........................59, 60

<u>Rogers v. Bisono</u>, 2016 U.S. Dist. LEXIS 105096 .................................................. 59

<u>Rogoz v. City of Hartford</u>, 796 F.3d 236, 247 (2d Cir. 2015) .................................. 36

<u>Salim v. Proulx</u>, 93 F.3d 86, 91 (2d Cir. 1996) ..................................................33, 35

<u>Scott v. Harris</u>, 550 U.S. 372 (2007) .................................................................43, 49

<u>Simon v. City of N.Y.</u>, 893 F.3d 83 (2d Cir. 2018) ................................................. 40

<u>Smalls v. Collins</u>, 10 F.4th 117, 124 (2d Cir. 2021) ............................................... 60

<u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983) ..............................................................56, 57

<u>Soto v. Gaudett</u>, 862 F.3d 148 (2d Cir. 2017) ........................................ 6, 7, 33, 37

<u>Swain v. Town of Wappinger</u>, 805 F. App'x 61 (2d Cir. 2020) ....................... 1, 35

<u>Swarna v. Al-Awadi</u>, 622 F.3d 123 (2d Cir. 2010) ................................................. 55

iv

Tennessee v. Garner, 471 U.S. 1 (1985) ............................. 35, 36, 38, 41, 43, 49, 50

Terebesi v. Torreso, 764 F.3d 217 (2d Cir. 2014) ............................................33, 39

Thevenin v. French, 850 Fed. Appx. 32 (2d Cir. 2021) ......................................... 38

Ting v. United States of America et al., 927 F.2d 1504 (9th Cir. 1991) ................. 44

Tolan v. Cotton, 572 U.S. 650 (2014).................................................................... 38

Toussie v. Powell, 323 F.3d 178 (2d Cir. 2003) ............................................55, 58

United States v. Jordan, 2017 U.S. Dist. LEXIS 176115 ...................................... 57

Washington v. Detective, 29 F.4th 93, 103 (2d Cir. 2022) ................................... 6

Washpon v. Parr, 561 F. Supp. 2d 394 (S.D.N.Y. 2008)....................................... 42

Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000)..................................................59, 60

**STATUTES**

42 U.S.C. §1983 ....................................................................... 9, 39, 61

28 U.S.C. §1291 ................................................................................ 34

FRCP 56(a)........................................................................................ 38

## PRELIMINARY STATEMENT

This action stems from the fatal police shooting of the unarmed decedent Jose Hernandez-Rossy in the back by police. On May 7, 2017 after an abrupt car stop and a protracted beating inflicted by the defendants, the obviously unarmed decedent was shot in the back from about 100 feet away as he was running from an assault by the defendant officers who beat him and pistol whipped him to the ground.

On this appeal, this Court is urged to disregard all of the hard evidence that the defendants were engaged in wrongdoing from the outset, and all of the proof that in the moments leading up to the shooting both defendants knew that Rossy was obviously unarmed and presented no serious threat, in order to second guess the District Court's finding that "the disputed issues of material fact preclude extending qualified immunity to Officers Acquino or Tedesco at this stage." [SPA 17-19]. *See, Swain v. Town of Wappinger*, 805 F. App'x 61, 62 (2d Cir. 2020) ("If the District Court says the evidence was sufficient to create a jury issue, then that is the end of our review.")

To that end, appellants submit a 14-page statement of "facts" pressing the same narrative that was diametrically opposed by the Plaintiff Margarita Rossy, mother of the 26-year-old decedent Jose Hernandez-Rossy ("Rossy"). The defendants' debunked story is contrary to a great deal of direct evidence showing

that this was not a random traffic stop that went awry, but rather an intentional targeting of Rossy for an unlawful assault by defendants Joseph Acquino ("Acquino") and Justin Tedesco ("Tedesco"), both of whom already knew Rossy from prior occasions. [JA 21, 25-26].

Appellants give mere lip service to the Plaintiff's version of the facts on the appeal, and their entire argument is skewed by the same story that was rejected by the District Court that stated, "this Court disagrees with the City Defendants' contention that the facts are undisputed and well documented [SPA 19] (*see e.g.* Appellant Brief, DktEntry: 28.1, p. 2).

The denial of qualified immunity was based on Plaintiff's powerful evidence derived from multiple eyewitnesses, video of the critical moments leading up to Tedesco killing Rossy, forensic testing by the NYS Attorney General that disproved Acquino's false claim that Rossy had shot him, and Central Police Services ("CPS") audio recordings that establish the timing of critical events and recorded Tedesco's initial false radio report that planted his gun in Rossy's car, showing Tedesco's guilty state of mind right after he had shot Rossy in the back.

Appellants desperately trying to frame a legal issue for appeal, fail to recognize that the District Court clearly found two "widely disparate versions" [SPA 4] of the events that resulted in a man who was visibly unarmed and injured being shot in the back at long range. There is the appellants' version of a routine

2

traffic stop that inexplicably exploded into a violent car crash followed by a protracted beating and pistol whipping that ended in a visibly unarmed man being shot in the back from 30-40 yards away as he ran from the beating. [JA 1740, 3164, 3168].

On the other hand, Plaintiff's proof showed that Tedesco and Acquino went after Rossy in radio silence violating numerous police regulations, cutting off Rossy's car in an unsanctioned "Starsky and Hutch" maneuver allegedly due to the odor of marijuana. Then while still acting entirely "off the grid" they assaulted Rossy starting when Acquino immediately yanked the driver's door open and lunged into the car onto Rossy's lap. In so doing, Acquino injured his ear on the door frame of the car, landing on the legs and groin of Rossy and causing the car to accelerate into the house across the street. These unlawful actions were followed by a several minute beating, dragging, pushing and pulling, punching, and pistol whipping of Rossy during which they had their hands all over him, stripped him from the waist up, and thereby knew to a certainty that he was unarmed before shooting him from behind at more than 100 feet away.

Only after the shooting, did Tedesco finally break radio silence falsely reporting that Rossy's car had taken off with Tedesco's "gun in it." Acquino began to claim his torn ear was a gunshot wound and told bystanders to call 911. Despite being fully capable throughout the events, neither defendant ever called

in the car stop, or "shots fired", much less that Rossy (or Acquino) had been shot. None of the many witnesses ever saw Rossy with any weapon, nor saw or heard any gunfire except for Tedesco shooting Rossy. A few minutes after Rossy was shot, Acquino was found by a responding officer with a large bag of cocaine he had kept hidden in his vest, the origin of which Acquino swore he did not know.

Appellants claim legal error in Judge Skretny's finding that: "As shown by these competing versions of the facts, there remain numerous disputed issues of material fact." [SPA 18]. The appellants fault the District Court for finding that probable cause was controverted by many material facts presented by Plaintiff, as was the cause of Acquino's torn ear injury.

The Appellants' materiality argument ignores the District Court's finding that the "numerous disputed issues of material fact" specifically included "the justification for Officer Tedesco's use of lethal force." *Id*. Appellants' immunity claim also ignores the objective fact that their own behavior shows Tedesco and Acquino both knew Rossy was unarmed and had not shot or injured anyone. After Acquino was supposedly shot and was yelling that fact to Tedesco, neither one drew their weapon or called for help, but instead went into Rossy's crashed car and beat him, punched him, and dragged him out, wrestled him and knocked him down, and ultimately shot him from behind only after he ran from the ongoing assault. *See, O'Bert v. Vargo*, 331 F.3d 29, 39 (officer actions are strong circumstantial evidence

4

that the officers knew that O'Bert remained unarmed).

Simply put, the defendants did not *behave as if they believed Rossy had a gun or had just shot a cop moments earlier*. Acquino never drew his own gun or touched his radio, but the video evidence and his own testimony show that he was fully capable of doing so [JA 1636, 1652, 2678-2685].

The defendants assert none of these issues are "material" if Tedesco claims he subjectively thought his partner was shot. However, that is not what the law is under the longstanding test of objective reasonableness; otherwise, any claimed subjective belief would suffice to immunize fully against shootings of unarmed citizens. It also ignores the objective fact that Tedesco was standing right next to Acquino when he dove headfirst into the door frame of the car to grab Rossy and injured himself.

The appellants fail to recognize that a court "may not simply accept what may be a self-serving account by the police officer" where the victim is unable to testify for himself. *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003). Instead, "the court must also consider the 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" *Id*. The court must "undertake a fairly critical assessment of, inter alia, the officer's original reports or statements… to decide whether the officer's testimony could reasonably

be rejected at a trial." *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (*quoting, O'Bert*, 331 F.3d at 37).

The material issues of fact as found by the District Court are intertwined with Plaintiff's proof that the defendants' conduct was the product of unlawful intent from the outset, and that their false subsequent claims of justification were part of an orchestrated cover up to conceal their wrongdoing.

In this Circuit, interlocutory appeals may not be taken from denials of qualified immunity "[i]f resolution of the immunity defense depends upon disputed factual issues." *Washington v. Detective*, 29 F.4th 93, 103 (2d Circuit 2022) *quoting DiMarco v. Rome Hosp. & Murphy Mem'l Hosp*., 952 F.2d 661, 665 (2d Cir. 1992).

There is another fatal flaw in the defendants' appeal. The Decision and Order below found that Tedesco and Acquino were sued only in their "official capacities" and therefore dismissed Plaintiff's claims for individual liability and punitive damages against them [SPA 37]. This appeal by the "City Defendants" is limited to the denial of "qualified immunity"; but the defense of qualified immunity "does not belong to the governmental entity; [and] the entity itself is not allowed to assert that defense." *Soto v. Gaudett*, 862 F.3d 148, 163 (2d Cir. 2017). Therefore, the appeal by the "City Defendants" (See, Appellant Brief, DktEntry 28.1 p. 9, 57) was filed without any arguable legal basis from its inception.

6

## JURISDICTIONAL STATEMENT

This Court does not have jurisdiction to hear this appeal because the District Court denied summary judgment specifically finding there were several genuine issues of material fact related to the excessive force claims or granting qualified immunity [SPA 17-19] thus precluding appellate review of the issue of qualified immunity. *See, Bolmer v. Oliveira,* 594 F.3d 134, 141 (2d Cir. 2010) ("[W]e may not review the district court's ruling that 'the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense'")(*citation omitted*).

Further, the appellants do not have standing to appeal as "City Defendants" because the defense of qualified immunity "does not belong to the governmental entity; the entity itself is not allowed to assert that defense." *Soto v. Gaudett*, 862 F.3d 148, 163 (2d Cir. 2017).

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Should this Court dismiss this appeal because it lacks jurisdiction to review the genuineness of the material factual disputes in this case?

Yes, the District Court found "numerous disputed issues of material fact" regarding qualified immunity and the alleged justification for shooting Rossy in the back [SPA 18].

2.      Should this Court dismiss the City Defendants' appeal since the defense of qualified immunity is doctrinally inapplicable to the City Defendants?

Yes, that defense is legally unavailable to the "City Defendants" pursuant to their own motion and the resulting Decision and Order from which they appeal.

3.      Did the District Court err in dismissing the individual liability and punitive damages claims against Tedesco and Acquino?

Yes, those claims were properly pleaded against them individually, and the Plaintiff's proof of the egregious and unlawful conduct of Tedesco and Acquino is inextricably intertwined with the facts that foreclosed a qualified immunity defense.

4.      Did the District Court err in dismissing the Due Process claims of Plaintiff related to official misconduct, and the fabrication and tampering with evidence in a cover up of intentional civil rights violations?

Yes, under the corollary order doctrine those claims are justiciable and should not have been dismissed; they are also inextricably intertwined with the facts underlying the denial of qualified immunity based on Plaintiff's proof of intentional wrongdoing and a subsequent cover up.

## STATEMENT OF THE CASE

### I.      Procedural History

The Plaintiff filed her complaint on September 17, 2017 containing federal

civil rights claims under 42 U.S.C. §1983 and the 4th Amendment for the excessive use of deadly force, *Monell* claims, and Due Process claims for defendants' official misconduct in fabricating and tampering with evidence, as well as ancillary state law claims for failing to render medical care and allowing Rossy to bleed to death in custody [JA 21]. Issue was joined by the filing of defendants' Answer October 19, 2017 [JA 49]. Following discovery proceedings and cross motions for summary judgment, the District Court denied summary judgment to the defendant city and the named defendant officers on the federal civil rights claims for the excessive use of deadly force. The court below found genuine issues of fact surrounding the qualified immunity defense, and on the issues of excessive force and probable cause.

On the cross appeal, the court below dismissed the Plaintiff's claims for individual liability against Tedesco and Acquino and the claims for punitive damages; and dismissed plaintiff's remaining causes of action including official misconduct, and the fabrication and tampering with evidence.

The City defendants filed a notice of appeal limited to the issue of qualified immunity. The plaintiff cross appealed on the dismissal of her claims that are inextricably intertwined with the qualified immunity defense, and under the corollary order doctrine for the dismissal of claims for individual liability and punitive damages against the individual defendant officers for egregious

misconduct that they knew was wrong.

**II.          STATEMENT OF FACTS**

**A. The Events leading up to the Shooting**.

On May 7, 2017 defendant Justin Tedesco and defendant Joseph Acquino were patrolling in a marked unit in the Riverside section of Buffalo, New York at about 5:00 PM when they spotted a white 2011 white Acura SUV being operated by Jose Hernandez-Rossy and began following the vehicle. The two defendants each had prior dealings with Rossy, and first saw him that day under excellent conditions of observation at the intersection of East and Grace streets [JA 1594, 2688-2708, 2709, 2750-2754]. The defendants knowingly violated the Buffalo Police Manual of Procedures by failing to notify the police dispatcher that they were initiating a car stop, or that they had undertaken a slow speed pursuit of the SUV [JA 1544-1555, 3108-3114].

Acquino who had previously filed thirteen charges against Rossy that were all dismissed in open court three years earlier, directed Tedesco to cut off the Acura while heading east on Garfield Street after following it for two or three blocks [JA 1535, 1594-1603, 1606-1612, 2688, 2710]. Defendant Tedesco testified he cut off the car after following it less than one block, and that he was not trained to do this maneuver under these circumstances [JA 3107-3108]. The defendants both later alleged that the car stop was premised on the smell of marijuana from the moving vehicle, and

Tedesco said they recovered a three (3) inch long burning "blunt" from Rossy after rushing the car [JA 3098]. Both defendants claimed they handled the seized "blunt", but that evidence never materialized and was unaccounted for [JA 1544-1545]. Tedesco admitted he saw no moving violations committed by Rossy but that he cut the SUV off to see if the driver was smoking [JA 3064, 3073-3075]. A "vehicle pursuit" is not allowed under BPD regulations for anything less than a violent felony, and a supervisor must be involved [JA 2635].

The police car cut in front of the Acura on a 45-degree angle after speeding past it on the wrong side of the road on Garfield St. at the corner of Hartman Place. [JA. 2677, 2723, 3069-3070]. This unorthodox maneuver violated the police regulations for a car stop in several respects [JA 2638-2639]. Both defendants immediately went to the driver's door of the Acura [JA 1539-1540, 1911]. Acquino reached in and pulled open the car door and then "jumped" into the car to grab Mr. Rossy [JA 1463, 1624-1626, 1914].

Acquino told investigators three days after the event that he saw Rossy reach for his right jacket pocket and he "jumped on his right hip" demonstrating with both hands [JA. 1463, 2721]. However, Acquino's description of how he went into the car and grabbed Rossy totally conflicts with Tedesco's description who was next to him at the driver's door [JA 1750]. Acquino said he dove forward and grabbed Rossy's right-side pocket with both his hands and was hanging "half out"

11

of the car as it took off [JA 1463-1464]. Tedesco said Acquino grabbed both of Rossy's hands at the car door and then Acquino "sprang" all the way into the car and it took off [JA 1750-1751, 2837]. Acquino claimed he was hanging out the driver's door of the car. Tedesco was sure that Acquino went "completely" inside the car, the door was closed but not latched, and his legs were not outside of the car at all when it took off [JA 1750-1751, 1760].

According to both defendants and two witnesses, Acquino jumped into the car and it took off and crashed into a house on the other side of the intersection. Eyewitness Gino Fresco was nearby on the northwest corner of the intersection and had a clear view of the officers as they faced the driver's door of Rossy's car. His statement to police that night said that the car "must have been in gear" because it took off when Acquino "jumped into the car." [JA 1914, 1916-1917].

An 11-year-old witness who was watching from Garfield St. saw Acquino "pull a cigarette" from the driver and go headfirst into the car as it took off, crossed Hartman St. and crashed into the house at 27 Hartman St. [JA 2042]. Tedesco ran across the intersection after the crash and entered the car from the passenger side door. Eyewitness Emmanuel Ortiz emerged from his doorway next to the car crashed against his house and saw Tedesco inside punching Rossy in the face, and Acquino dragging Rossy by the head out onto the ground; neither officer had a weapon drawn [JA 1792-1796].

12

Acquino had his arm around Rossy's head and yanked him out straight through the bushes onto the sidewalk [JA 1798]. Tedesco testified he then had Rossy locked up from behind on the ground, using a leg scissors hold around his body [JA 3148]. The two defendants continued to subdue Rossy who was observed to be unarmed, did not strike back, punch, kick, or use "offensive violence" against either defendant, or reach for their weapons [JA 1836-1839, 1924-1925].

Tedesco released Rossy from the scissors hold and both he and Acquino continued their physical assault on Rossy into the street where a bystander began to videotape the events showing Rossy's defensive posture [JA 2678-2686]. Tedesco drew his gun and was using it like a club as Acquino disengaged and watched from 10 feet away as Tedesco pulled Rossy's jacket over his head. Tedesco testified he then "wound up and whacked him on the side of the head with the gun." [JA 3164-3165]. Eyewitness Van Dusen testified Tedesco pistol whipped Rossy to the ground after pushing him backwards onto the sidewalk and just moments before Rossy got up and ran and was shot in the back [JA 2143-2144, 3399-3411].

13

The autopsy finding was homicide. In addition to the rear entry gunshot wound, it showed Rossy suffered more than six (6) dozen blunt force impact injuries and abrasions all over his head, face, back and torso from the beating, the last part of which was caught on the bystander's video tape from the southwest corner of the intersection [JA 2755-2759].

**The Car Stop**

The defendants first spotted Rossy when they pulled up at right angles to him at the small intersection of East Avenue and Grace Street on a sunny afternoon [JA 2709, 3049]. Rossy was at the stop sign on Grace Street to the defendants' right, a short distance away under excellent lighting conditions. The driver's window of the Acura was down and provided a clear unobstructed view of Rossy who then proceeded through the intersection in front of the defendants by making a right turn onto East Avenue; the defendants in Housing Unit 164 then followed heading north on East Avenue [JA 3050-3052].

 As both vehicles proceeded north one block towards Garfield St., the  Acura stopped, signaled and turned right onto Garfield Street [JA 3064]. Tedesco stated that they began a slow speed pursuit northbound on East Avenue using their overhead lights without a siren, allegedly due to the smell of marijuana [JA 3057-3059, 3062-3063]. Tedesco sped past  the Acura on the wrong side of the road on Garfield Street, cutting it off at the end of the block where Garfield intersects with

14

Hartman Place [JA 1533-1535, 1955, 2723]. Acquino said that during the slow speed pursuit they used the lights and siren and the Acura kept pulling to the right almost stopping, and then continued [JA 1531-1533, 1536-1537]. Tedesco the driver of the police car stated they "pursued" Rossy one block on East Avenue and then one block on Garfield at 30 mph or less, but that Rossy did not stop repeatedly [JA 3066-3070]. Gino Fresco, Timothy Best and Tedesco all contradicted Acquino's claim that the siren was used before they cut Rossy off at the corner [JA 2014-2015, 2042, 3058-59, 3070].

Both Acquino and Tedesco intentionally violated a multitude of important provisions of the Buffalo Police Manual of Procedures during their activities leading up to Rossy's death. First, the defendants initiated a pursuit and a car stop while intentionally failing to notify the police dispatcher of any of their activities until after Tedesco had shot Rossy in the back [JA 1544-1548, 3108-3114]. Both defendants knew the BPD Manual of Procedures required that the radio dispatcher *must* be notified before initiating any car stop, and be told the location, the reason for the car stop, the plate number, and the number of occupants of the vehicle [JA 1548-1553, 2638].

The defendants also intentionally ignored BPD police regulations that require a supervisor be notified during any car pursuit in order to exercise "careful decision making." [JA 1554-1556, 2635-2636]. In fact, the car pursuit and the cut

15

off maneuver were done completely "off the grid" in radio silence and were prohibited from the outset under BPD regulations that proscribe car pursuits for traffic infractions, misdemeanors and nonviolent felonies [JA 1557-1558, 2635]. The aggressive and risky cut off maneuver and frontal approach violated specific BPD police regulations and was contrary to the training of Tedesco and Acquino [JA 2638-2639, 3108-3109].

The expert review of Professor Emeritus George Kirkland found that "the violations of fundamental and well-established police procedures by Officers Joseph Acquino and Justin Tedesco were a significant and proximate cause of the eminently preventable shooting death of Jose Hernandez Rossy." [JA 2731-2732].

**B. The Fatal Shooting**

Both defendants knew from their observations that Rossy was unarmed by the time Acquino began yelling "Shoot him, shoot him" at the tail end of the beating and just before Rossy regained his feet and ran for his life [JA 1830-1831, 1858-1860, 2136-2137]. The defendants both knew Rossy had no weapon because he was half-naked with his underwear fully exposed; he was visibly unarmed and empty handed during the 2-3 minutes after the crash leading up to Tedesco shooting him in the back [JA 1837-1838, 3167-3169]. The City Defendants extracted over 20 still frame photos from the video that prove Tedesco and Acquino both knew Rossy was unarmed in the moments leading up to Tedesco's lethal shooting [JA

16

2678-2685, 3399-3411].

Further, the evidence shows there was extensive close physical contact with Rossy inside the car as Tedesco and Acquino grabbed him, punched him, and pulled him by the head from the car onto the ground outside [JA 1792-1796, 1839-1842, 3139-3143]. Tedesco then had Rossy's torso in a leg scissors from behind and could see and feel his empty hands during the continuing struggle [JA 3148-3149, 3152-3153, 3167-3169].

Both defendants continued in close physical contact with Rossy for several minutes outside the car in broad daylight with their hands on him in what amounted to a full body search [JA 3168-3169]. By the time they were done, they had pulled his jacket and shirt over his head stripping him and leaving him naked from the waist up with his entire torso and underwear fully exposed [JA 2678-2681].

There were at least 8 eyewitnesses nearby watching from all directions and none of them ever saw Rossy with a weapon of any kind throughout the events. [JA 1796, 1836-1838, 1916, 1920, 2126, 2136-37]. One of the eyewitnesses yelled twice at Tedesco as he took a shooter's stance, not to shoot Rossy because Rossy was obviously unarmed and had his back to Tedesco when Tedesco opened fire [JA 2292].

17

The objective facts show that at the time Tedesco killed Rossy, he shot a visibly unarmed person without warning in the back from almost a block away after a protracted physical beating [JA 3168-3169, 3399-3405]. None of what Tedesco had previously seen or heard was threatening enough for him (or Acquino) to use deadly force, or even draw their weapons earlier in response. The physical beating inflicted on Rossy moved from the front seat of the car, to outside on the ground, then through the bushes and into the street, and back up onto the sidewalk. The assault on Rossy covered 2-3 minutes, not mere seconds [JA 1870, 1881]. The fatal shooting was attenuated in both time and distance from where Acquino injured his ear by jumping into the car; and from the disabled car which was a non-issue as to the decision to shoot Rossy in the back.

Rossy was not observed by any witness to have struck, kicked or hit either officer and he remained in a defensive posture during the beating that ended up with him being pistol whipped to the ground by Tedesco [JA 2143-2144] Eyewitness Mark Van Dusen testified that he told a police lieutenant he knew that he had "witnessed a murder by a police officer" and he had been subpoenaed to testify [JA 2156-2157]. BPD Lieutenant Hofschneider told him to ignore the subpoena and Van Dusen "threw it in the trash" and did not appear until the U.S. Marshalls served a court order on him and he decided to appear [JA 2146, 2149-2153].

Professor Kirkland pointed out "Both Acquino and Tedesco were also in a

18

position to observe Rossy running away from them clad only in a pair of pants with no weapon in his hands. Despite this, incredibly, Acquino admitted in an IAD interview that he told his partner: "Bro, fucking kill him!" [JA 2737, 3249].

## C. The Defendants' Cover Up Began as the Events Unfolded

Tedesco finally broke radio silence after shooting Rossy in the back from 30-40 yards away on Garfield St. [JA 1754]. Again in violation of department procedures he did not notify the dispatcher that any shots had been fired, or that he had shot a civilian. [JA 1655-1656, 2649]. Most egregiously, Tedesco lied to the police dispatcher in his first radio call that day by fabricating a false claim stating: "We had a car take off on us and went into a house. My gun's in it!" [JA 1433, 1454 - Audio file 02].

Two years later in his deposition, Tedesco then lied under oath not only about what he first told the police dispatcher, but he also lied about when he made that initial radio call with the phony story about his gun being in Rossy's car. Tedesco falsely testified that he made his initial radio call while he was running across the intersection to where the Acura had just crashed into the house [JA 3131-3132]. However, the Erie County Central Police Services ("CPS") records and recordings prove that Tedesco's first radio transmission came much later, only *after* the crash, and after the protracted beating, and after he had shot Rossy in the back.

Tedesco's initial radio call is Audio file 02 in the CPS digital recordings on CD #17-1270585 [JA 1433, 1454 - Audio file 02]. Tedesco's radio call came in after three 911 calls made that day by witnesses who had already reported hearing Tedesco's three (3) gunshots, one of which killed Rossy.  The first 911 call that day came from Tasha Middlebrooks who also occupied the house where the Acura crashed; she reported Tedesco's gunfire at 5:12:25 pm on CD #17-1270586. [JA 1398-1402]. The second 911 call that day was made by Candace Olivera reporting gunfire at 5:12:32 pm - "I heard shots fired that's all I heard was many shots fired." [JA 1403-1412]. The third 911 call came in 3 seconds later at 5:12:35 pm from Amanda Hudson who reported: "The police officer just shot the man in the back three fuckin' times and there's kids out here. Oh, my God." [JA 1413-1417].

Tedesco's initial radio call was digitally recorded on CD #17-1270585 as Audio file 02 and came in after Candace Olivera's 911 call reporting the shots fired on Audio file 01 on the same CD #17-1270585. Olivera's 911 call was preceded by 7 seconds by Middlebrooks's 911 call who had also already reported Tedesco's gunfire. The contents of the 911 calls made before Tedesco finally got on the radio prove that Tedesco had already shot Rossy in the back when he reported his gun was in Rossy's car.

The CPS records and recordings prove Tedesco lied at his deposition not only about what he said about losing his gun, but also when he said it. Candace Olivera's 911 call and all of the subsequent sequential police radio transmissions are contained on CD #17-1270585 and recorded as Audio files 01-115. [JA 1432-1454].

Tedesco denied saying what he said about his gun being in Rossy's possession; however, Audio file 04 is the police dispatcher clearly repeating Tedesco's bogus report over the air.

Dispatcher: "Ok, some car took off. The officer's gun's in it. What location are you at?"

The police recordings show Tedesco brazenly lied at his deposition when he claimed to have said "my guy's in the car" and not "my gun's in" the car when he finally broke radio silence after shooting Rossy [JA 3131-3132]. The certification for the accuracy and authenticity for all the CPS records and recordings submitted by plaintiff was not contested by appellants below [JA 1383-1397]. In fact, the appellants produced the same records in discovery [JA 1377-1382].

After being shot, Rossy ran about two blocks bleeding out from the severed brachial artery caused by one of Tedesco's three gunshots that hit him in the back of his upper left arm. [JA 2755, 2757]. The police responded to 568 Tonawanda Street where the last of the above- referenced six 911 calls was made by Carly Collier under CD #1270592 at 5:16:55 pm when she reported a man "bleeding out"

21

in the driveway next door [JA 1427-1428].

The first officers found Rossy actively bleeding from a through and through gunshot wound to his left upper arm in a driveway about two blocks from the shooting scene [JA 907-910]. At that time, Rossy was still alert and talking to the neighbor who called 911 and was also talking to the first officers when they arrived [JA 2562-2563, 2838-2839, 1038, 1052]. P.O. Rivera also heard Rossy yelling that he could not breathe when other Buffalo officers started doing chest compressions on him while he was awake [JA 2608-2609].

The police did not apply a tourniquet to Mr. Rossy's arm in time to save him from bleeding to death from the severed artery in his left arm. The defendant AMR ambulance EMTs did not arrive until 5:32pm, which was 20 minutes after Rossy was shot by Tedesco [JA 2844]. The Buffalo police officers in front of 568 Tonawanda St. in an incredible display of callousness had sent away the first AMR ambulance that arrived on scene as Rossy was bleeding to death in the driveway [JA 2769-2770, 2842-2844].

Tedesco was present at the end of the driveway in white sleeves when one of his fellow officers ran out to the stopped ambulance at 5:29 pm and sent it around the corner to Garfield St. where Acquino was waiting with a non-life-threatening ear laceration. [JA 2843]. It would be more than 3 minutes before another AMR ambulance arrived on scene, which probably cost Rossy his life [JA 2844].

22

**Acquino Lied about being Shot.**

In the shooting's aftermath, Acquino made up a story that he "felt" a small gun in Rossy's pocket and that Rossy shot him in the ear as the car crossed the intersection [JA 1463-1465] This story proved to be false based on scientific findings of the New York Attorney General's forensic testing, admissible pursuant to Fed. R. Evid. 803 (8)(A)(iii) [JA 2785, 2810-2814]. The forensic testing of the car's interior and Rossy's clothing revealed there was no gunfire inside the c a r where Acquino claimed he got shot just before the car hit the house [JA 1456, 1473-1476].

In addition to the forensic testing revealing there was no gunfire residue, Acquino's medical treatment revealed there was no stippling, or powder burns on Acquino's face, and no hearing loss, even though he claimed the gun went off inches from his right ear [JA 1468, 2721-2722]. Acquino misled the investigators by claiming his doctors had verified that he was shot [JA 1479]. In actuality, the two physicians found no entry or exit wound, no powder burns or stippling, only a "directional tear" of his right ear, and a very swollen jaw and bruising that resulted from Acquino diving headfirst into the doorframe of the car. The ENT surgeon Dr. Belles did not provide an opinion that the ear was injured by gunshot and stated it could be caused in a "number of ways" involving "significant force." [JA 2749, 2764-2765].

Eyewitness Emmanuel Ortiz was a Licensed Practical Nurse ("LPN") and approached Acquino at the scene with a towel for his ear after Rossy was shot by Tedesco. LPN Ortiz who had also previously been in the U.S. Army described the ear injury as "a clean tear" and testified when he first saw the injury it was white and not bleeding, as if you "scraped your knuckle or something." [JA 1797, 1805-1807,1842].

Further, BPD and several other state and federal agencies conducted an exhaustive search of the Acura and all the surrounding areas lasting through the next day and there was no evidence of another firearm ever located in the investigation [JA 2785]. None of the multiple witnesses including the defendants themselves ever saw Rossy with any weapon at any time, nor did anyone see or hear any gunfire, except for Tedesco's three gunshots at Rossy [JA 1621-1622, 3128-3130, 3168-3169].

Tedesco saw the Acura take off when Acquino dove into the car, and he watched it cross the intersection and crash into the house across the street. Tedesco saw no muzzle flash and heard no gunfire in the car at the time he later claimed to think Acquino had been shot [JA 3122, 3130]. Further, both defendants were inside the Acura immediately after the crash and neither of them saw any gun while they were grabbing and punching Rossy in the front seat, or when they dragged him out of the car.

24

Emmanuel Ortiz was in his house when it was hit by the Acura; he specifically testified there was no sound of gunfire before the car hit his house [JA 1879]. He ran outside and from about 10-15 feet away observed both defendants grabbing and striking Rossy inside the car and then saw Acquino pull Rossy out and through the hedges onto the ground. Contrary to both defendants' later claims, Ortiz testified that Acquino was *not shouting that he had been shot*, and that he never said that until after Rossy had been shot from behind [JA 1831-1833, 1841-1842].

After Tedesco shot Rossy, LPN Ortiz went over to Acquino with a towel for his ear and then followed him to the corner. LPN Ortiz contradicted Acquino's claim that he passed out at the corner, testifying that Acquino was "conscious" there and he saw Acquino pull out a large clear plastic bag of drugs from inside his vest [JA 1847-1852]. Acquino told investigators: "I remember all I did was hand him [P.O. Bierl] a huge bag of drugs that I have no idea where that even came from and that was it." [JA 1466, 1477, 2786].

Gino Fresco was nearby on the northwest corner and likewise never heard Acquino say he was shot or that Rossy had a gun [JA 1916, 1962, 1985]. The independent eyewitness testimony and the cell phone video flatly contradict defendants' claims that Acquino was screaming continually to Tedesco that he had been shot from the time the Acura crashed against the house [JA 1465, 1624, 1627].

**Defendants Altered the Crime Scene**

After Tedesco shot Rossy, he went back and moved the police car altering the crime scene before it was photographed and diagramed by CSU investigators. The cut off maneuver violated police regulations, and altering the scene to obscure that maneuver also violated regulations [JA 2638-2639, *see*, Dkt 106-31, p. 6-8]. In his deposition Tedesco claimed he only returned to the police car after shooting Rossy to get "his keys." [JA 3182-3183]. However, eyewitness Van Dusen saw Tedesco return to the police car after shooting Rossy and move the car [JA 2117, 2173]

The position of the Acura facing northeast as photographed by CSU proved it had been moved after the shooting [JA 2672] because according to both defendants, Tedesco had sped past the Acura on the driver's side and cut it off by turning to the right so that the police car ended up facing southeast [JA 2723]. The investigation of the Attorney General could not reconcile the defendants' statements with the position of their police car as shown in the CSU photos since no officer admitted moving the police car at the crime scene.

Due to the discrepancy between the position of the police car shown by the CSU photos and the defendants' account of cutting off the Acura, Acquino was requested to return to the scene after both he and Tedesco had given their official statements and show investigators the position and location of the cut off maneuver. Acquino returned on May 18, 2017 and intentionally misled investigators

26

by falsely placing the car stop location approximately 100 feet back from the intersection where it really happened [JA 2673-2674, 2677].

Eyewitness Gino Fresco was on the northwest corner and saw the police car cut Rossy off right at the corner, and then saw the Acura abruptly take off as Acquino "jumped" into the car and crash [JA 1943, 1961]. Fresco stated that the cut off happened "right on the corner" between his house and the red house on the southwest corner [JA 1972]. Eyewitness Morrison saw the police with the Acura right outside his dining room window from the red house on the southwest corner of the intersection [JA 2251-2252].

In addition to lying to the investigators on May 18, 2017 about the car stop location, Acquino gave false deposition testimony insisting the fake car stop location was correct by referencing the concrete driveway to the west of the rear yard of the red house on the southwest corner of Garfield and Hartman [JA 1573-1577, 2673].

However, images of the scene plaintiff had obtained by subpoena from the WGRZ television news conclusively established the true location of the car stop at the intersection before Tedesco moved the police car to obfuscate the scene [JA 2723]. The true location and position of Housing Unit 164 shown in the WGRZ image is exactly where the witnesses said the car stop took place [JA 1972, 2251-2252].

27

Defendant Acquino staged the scene of the car stop 11 days after the shooting to fit his fabricated version of the events. The true location did not allow enough time for the series of concocted events Acquino claimed unfolded in the moving Acura. This included hand wrestling over Rossy's pocket, crashing against the patrol car, looking up and allegedly seeing a kid on a bike, letting go of Rossy's pocket, grabbing the wheel and allegedly steering around the kid, then hearing "fireworks" and then leaving the roadway and hitting the house.

At his deposition, Acquino falsely denied staging the scene by placing the cut off maneuver 100 feet back from the intersection. When confronted with the WGRZ photo of his police unit 164 at the intersection, Acquino falsely swore that it was not Housing Unit 164 shown in WGRZ photo facing southeast at the corner before Tedesco moved the car [JA 1579-1580, 2723, 2768]. Acquino's false testimony on this point is proved by the digital WGRZ image [JA 2763] and the CSU photo [JA 2724], each of which show that his Unit 164 can be identified by the word "Housing" on the right rear quarter panel, and the large number "164" on the trunk, the bent back passenger side mirror, and there is also a very distinctive black mark on the right side of the rear bumper in the shape of an upside-down horseshoe.

## THE DISTRICT COURT'S DECISION AND ORDER

The District Court denied summary judgment to the defendant city and the named defendant officers on the federal civil rights claims for the excessive use of

28

deadly force. The court below specifically found "numerous disputed issues of material fact" surrounding the qualified immunity defense, and on the issues of excessive force and probable cause, the cause of Aquino's injury, and the justification for the use of lethal force [SPA 18-19].

The court below dismissed the Plaintiff's claims for individual liability against Tedesco and Aquino and the claims for punitive damages, finding the defendants were sued only in their official capacities; and also dismissed plaintiff's remaining causes of action including the *Monell* claim, negligence and wrongful death for allowing Rossy to bleed to death after he was in custody, and the claims for official misconduct for fabricating and tampering with evidence on a finding that those claims sounded in state law "spoliation" claims which are not recognized in New York [SPA 36-37] The District Court also decided that while Plaintiff argued the fabrication of evidence implicated her due process rights [JA 3429-3432], Plaintiff had not shown that "the altered material was forwarded to the prosecution or used in a proceeding." [SPA 35].

## SUMMARY OF ARGUMENT

In seeking review of the District Court's determination, defendants disregard the requirement that an appeal from a denial of summary judgment on qualified immunity grounds must accept the non-moving party's version of the facts. The City Defendants argue their version of the facts entitle them to qualified immunity, but it does not.

To avoid several genuine issues of material fact which the District Court found require a trial as to the reasonableness of the shooting, defendants argue those issues are not "material" issues as to qualified immunity. The City Defendants have adopted the position that it is irrelevant whether Acquino and Tedesco were committing crimes under the color of law, or if they knew Rossy was unarmed as they beat him and ultimately shot him to death in a defenseless position. Tedesco's claims that he thought Rossy was armed or that he had injured Acquino are not objectively reasonable given the evidence, and any reasonable officer would have known it was "clearly established" that he could not use lethal force under the circumstances. Accepting the defendants' argument on the facts of this case would insulate every officer with blanket qualified immunity on a claim of subjective fear even if it was not objectively reasonable.

As the District Court found, appellants' position is contradicted by objective facts presented by plaintiff, and by this Court's holdings on objective reasonableness. *O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003) and *Rasanen v. Doe,* 723 F.3d 325 (2d Cir. 2013) held that it is unreasonable to shoot an unarmed civilian unless the officer has probable cause to believe the suspect is an imminent threat to the officer or another person at that time. Although the defendants argue that Supreme Court precedents, and cases in this Circuit and decisions from outside of it, mandate a contrary finding, unarmed civilians who pose no immediate threat to law enforcement officers or the public have a constitutional right not to be shot in the back at long range. The high-

risk, high speed vehicle pursuit cases that appellants rely on are totally different factually and offer no persuasive authority here.

Any determination of the objective reasonableness of using deadly force requires a review of whether Rossy presented a threat when Tedesco opened fire, but solely through the prism of events most favorable to Rossy, the non-movant. While the City Defendants purport to adopt Rossy's version of the facts, they do not do so, and their brief portrays Rossy as a violent fleeing felon who almost ran over a kid and dragged Acquino into his car and shot him. This version of the facts is based on the incredible and disproven claims of the appellants and is contradicted by independent witness testimony, scientific proof, and video of the events leading up to the shooting.

It also ignores strong evidence that Tedesco and Acquino both knew Rossy was unarmed when he was shot in the back, and that Acquino had a serious run-in with Rossy previously; and that the defendants violated a litany of police procedures while operating "off the grid" aggressively cutting off his car and assaulting him, then falsely reported that Tedesco's gun was in Rossy's car at the time Acquino allegedly "got shot" and finally, a large bag of drugs mysteriously appeared from inside Acquino's clothes in the aftermath of the shooting.

Crucially, in the minutes leading up to killing Rossy both defendants knew he was unarmed from their own observations while pushing, pulling, grabbing and striking him repeatedly. The objective video proof shows he was shirtless and visibly

31

unarmed in broad daylight before Tedesco shot him in the back from 30-40 yards away at Acquino's urging. The objective facts regarding the killing itself could have supported a judgment that the shooting was excessive as a matter of law.

In disregarding plaintiff's hard evidence, the Defendant City's entire version of events presupposes that Tedesco and Acquino's actions that day were taken in furtherance of a lawful police purpose. However, uniformed police patrol activities taken in furtherance of a lawful police purpose do not begin in concealment, and do not involve the conscious violation of a myriad of critical police regulations, or the fabrication of evidence, and major discrepancies in the accounts given by the principals, and false testimony on material facts regarding the events. Finally, lawful patrol activities do not result in unexplained quantities of narcotics being concealed inside the officer's uniform at the end of a fatal melee [JA 1466, 1847-1852, 2784].

This Court has appellate jurisdiction "to determine whether [a disputed factual] issue is material, but not whether it is genuine" *Garcia v. Sistarenik,* 603 F. App'x 61, 62 (2d Cir. 2015) *quoting, Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010) and therefore the City's appeal must be dismissed due to City Defendants' insistence on proceeding with their own version of the facts.

## STANDARD OF REVIEW

"[A]fter the denial of the defendants' motions for summary judgment" the Court has "jurisdiction to review a denial of qualified immunity to the extent it can be resolved on stipulated facts, or *on the facts that the plaintiff alleges are true*, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Terebesi v. Torreso*, 764 F.3d 217, 222 (2d Cir. 2014) (*quoting Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) *cert. denied* 135 S. Ct. 1842, 191 L. Ed. 2d 723 (2015). "What we may not do, after Johnson and Behrens, is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996).

## POINT I

## THE COURT LACKS JURISDICTION
## TO HEAR THIS APPEAL

### A. The District Court Found Material Issues of Fact on the Qualified Immunity Defense.

This Court does not have jurisdiction to hear this appeal. As the District Court found there are genuine issues of material fact regarding defendants' version of the events immediately before the shooting, appellate review of qualified immunity is not available. *Soto v. Gaudett,* 862 F.3d 148, 156 (2d Cir. 2017); *Bryant v. Egan,* 890

F.3d 382, 386 (2d Cir. 2018).

As noted by this Court in *Bolmer v. Oliveira,* 594 F.3d 134, 140 (2d Cir. 2010) "[o]rders denying summary judgment are generally not immediately appealable 'final decisions' under 28 U.S.C. § 1291." However, the "Court has jurisdiction over interlocutory appeals based on qualified immunity when the defense can be decided based on questions of law and is not dependent on the resolution of factual issues." *Brown v. Halpin,* 885 F.3d 111, 117 (2d Cir. 2018).

In reviewing whether the lower court properly found genuine issues of material fact, the Court applies a *de novo* standard of review. *See Bolmer v. Oliveira,* 594 F.3d 134, 141 (2d Cir. 2010)("[W]e may not review the district court's ruling that 'the plaintiffs evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense.' Cabined by these constraints, our review is *de novo*").

"Thus, an interlocutory appeal is only appropriate to determine whether the defendant is entitled to qualified immunity as a matter of law on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Bolmer v. Oliveira,* 594 F.3d at 141; *see also*, *Frierson v. Reinisch,* 804 F. App'x. 54 2020 WL 1490884 (2d Cir. 2020); *Marrero for Estate of Morales v. Cote,* 756 F. App'x 79, 80 (2d Cir. 2019) (dismissing appeal since defendant relied on his version of events).

In *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014) the Court held again that a

34

District Court denial of summary judgment based on a determination of "evidence sufficiency" does not present a legal question sufficient to invoke appellate jurisdiction on an interlocutory appeal as to qualified immunity. *Id* at 772. Indeed, an appeals court may not "entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). "If the District Court says the evidence was sufficient to create a jury issue, then that is the end of our review." *Swain v. Town of Wappinger*, 805 F. App'x 61, 62 (2d Cir. 2020).

While appellants attempt to frame their appeal as a pure question of law - that it was not clearly established law that Tedesco could not use deadly force by shooting an unarmed civilian in the back under the circumstances presented by plaintiff, their argument fails because District Court found "numerous disputed issues of material fact" including the "justification for the use of lethal force" pursuant to well-settled decisional law in factually similar cases involving unarmed civilians such as *O'Bert*, *supra*; and *Rasanen v. Doe,* 723 F3d 325, 331 (2d Cir. 2013).

Appellants discount the importance of the seminal case of *Tennessee v. Garner*, 471 U.S. 1 (1985), however the facts there also involved the shooting an unarmed civilian in the back who was alleged to be a fleeing felon. The Court held that "[w]here the suspect poses no *immediate* threat to the officer and no threat to others, the harm

resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)(emphasis added)

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Circuit 2004) *citing, O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003). And where a reasonable jury could find that the officers use of force was not a reasonable response to the circumstances, the "determination as to the objective reasonableness of the force used must be made by a jury following a trial." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004).

**B. City Defendants Have No Qualified Immunity Defense**

The defendants have no legal standing to assert a qualified immunity defense as a matter of law because the Decision and Order from which they appeal dismissed the claims against the Tedesco and Acquino in their individual capacities, and they remain in this action only in their official representative capacities [SPA 37]. "The doctrine of qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (internal quotations omitted). However, the defense of qualified

36

immunity "does not belong to the governmental entity; the entity itself is not allowed to assert that defense." *Soto v. Gaudett*, 862 F.3d 148, 163 (2d Cir. 2017). Thus, "[when] a suit against a government official in his official capacity is the equivalent of a suit against the government entity, the defense of qualified immunity is also unavailable to the individual sued in his official capacity." *see also, Kentucky v. Graham*, 473 U.S. 159, 166-167 (1985) ("In an official-capacity action, these defenses [qualified immunity] are unavailable.")

The City Defendants limited their appeal to the issue of qualified immunity. However, entitlement to qualified immunity is a defense that is doctrinally inapplicable to them under the order from which they appeal. Therefore, the appeal is not "substantial", and should be dismissed for lack of appellate jurisdiction. *Soto v. Gaudett*, 862 F.3d 148, 163 (2d Cir. 2017) *citing, In re State Police Litigation*, 88 F.3d 111, 124 (2d Cir 1996); *Mitchell v. Forsyth*, 472 U.S. 511, 525-527 (1985).

## POINT II

### DISTRICT COURT PROPERLY RULED THAT DEFENDANTS WERE NOT ENTITLED TO QUALIFIED IMMUNITY

The City Defendants claim that the District Court's denial of summary judgment on qualified immunity grounds was erroneously based on issues that were immaterial to that determination, or that it was not clearly established that Tedesco could not use deadly force if he knew that Rossy was unarmed and had not

shot Acquino in the ear. The City Defendants are wrong on both counts.

This Court's decisions in *O'Bert and Rasanen,* and the landmark decision in *Tennessee v. Garner*, 471 U.S. 1 (1985) make it plain that unless Tedesco had probable cause to believe that Rossy was armed or presented an immediate threat at that moment, then he could not shoot Rossy in the back without violating Rossy's Fourth Amendment rights. *Accord, Thevenin v. French*, 850 Fed. Appx. 32 (2d Cir. 2021). Accordingly, the District Court's order denying summary judgment was correct.

## A.    The Mechanism for Determining Qualified Immunity

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts must be viewed in the light most favorable to the party who opposes the motion for summary judgment and if those facts would be enough to allow a reasonable jury to decide the case in favor of the opposing party, summary judgment should be denied. The court's role at summary judgment is not to judge the credibility of witnesses or to resolve contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally, Tolan v. Cotton*, 572 U.S. 650, (2014) (per curiam); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Qualified immunity protects a police officer from liability if "(1) his conduct

38

[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010).

As held by the Supreme Court, police "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (*quoting Reichle v. Howards*, 566 U.S. 658, 664 (2012). A right is clearly established when its "'contours . . . are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (*quoting, Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "[A] case directly on point" is unnecessary, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. Moreover, it can be sufficient notice of the right if governing precedents "clearly foreshadow" the constitutional right violated such that the defendants are not entitled to qualified immunity. *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks omitted).

Finally, "officials can still be on notice that their conduct violates [clearly] established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730,

741 (2002), and "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," *Simon v. City of N.Y.*, 893 F.3d 83, 97 (2d Cir. 2018) *quoting, Wesby*, 583 U.S. 48, 64 (internal citations omitted)

The appellants have focused their appeal on the "clearly established law" prong of the qualified immunity analysis (i.e., whether any constitutional violation amounted to a violation of clearly established law of which any objectively reasonable officer would have been aware). Absent extraordinary circumstances, if the law was clearly established, the defendant official is not entitled to summary judgment on his immunity defense "since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) Finally, there is no requirement to address the two parts of the qualified immunity analysis in any particular order, and the inquiry on both issues derives from a standard of objective reasonableness. *See, Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

The Second Circuit has stated that in excessive force cases the qualified immunity and Fourth Amendment analyses often "converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003) (citation omitted). Accordingly, the answer to either the qualified immunity or the Fourth Amendment question often resolves the other. *Id*.

Given the settled law on shooting unarmed civilians under the *Garner* standard and Second Circuit decisional law, it was clearly established before Tedesco killed Rossy that his actions done at the urging of Acquino were unconstitutional. Any reasonable officer would have known that shooting an obviously unarmed civilian in the back at long range is universally condemned, and the facts here are sufficiently similar to *Garner*, *Rasanen* and *O'Bert* such that any reasonable officer would have known that the use of lethal force was excessive and unlawful.

On plaintiff's version of the facts, no reasonable officer would have believed the use of deadly force to be necessary. *See also, Bouggess v. Mattingly*, 482 F.3d 886, 891-92 (6th Cir. 2007) (denying qualified immunity at summary judgment for officer who shot and killed a fleeing felon who had violently resisted arrest but who the officer had no basis to conclude was armed).

Recognizing that violations of police procedure do not themselves establish an unconstitutional use of excessive force, the defendants' own regulations here are nevertheless relevant to what a reasonable officer under the same circumstances would have believed: Section 6.4 (A) "Deadly Force" states: "Members of the Department may use deadly physical force but only when it is necessary to defend the Officer or third person from what the Officer reasonably believes to be the use or imminent use of deadly physical force." [JA 2644] Likewise Section 6.5 (A) "Use of Firearms" limits use of lethal force to circumstances where there is a reasonable belief of the

41

imminent use of deadly physical force [JA 2645].

Courts deciding whether the amount of force used was reasonable consider "the totality of the circumstances faced by the officer on the scene." *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995). "Since the law in this area is well-established, 'in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.'" *Washpon v. Parr*, 561 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2008) (Buchwald, J.) (*quoting O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)

In an attempt to distinguish this case from similar precedents regarding the use of deadly force on an unarmed civilian, the appellants again rely only on their own version of the facts that was fully contradicted by the objective proof presented in the District Court which was the reason summary judgment was denied by Judge Skretny.

**B.     It Was Clearly Established that Rossy had a Right Not to Be Shot in the Back at Long Range While he was Visibly Unarmed and Posed No Significant Threat of Harm to the Officers or Others.**

Under the Fourth Amendment, police are limited to using "reasonable" force in effecting a seizure. *Graham v. Connor*, 490 U.S. 386 (1989). The reasonableness of a use of force depends on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. Killing a suspect

constitutes a seizure, *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), and the Fourth Amendment reasonableness standard applies. *Scott v. Harris*, 550 U.S. 372, 382-83 (2007). Using deadly force can be reasonable, however, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11.

First, Rossy had no weapon and that fact was readily apparent to both defendants during the several minutes preceding the killing. Second, District Court found a genuine material issue as to the cause of Acquino's ear injury which is integral to the objective reasonableness test set forth in *Garner, supra* for using deadly force [SPA 18]. The appellants disagree with District Court, and mistakenly posit that both "probable cause" and the "cause of Acquino's injury" are immaterial to the objective reasonableness test for qualified immunity and excessive force. [Appellant Brief, DktEntry 28.1 p. 33) They are wrong.

The forensic examination of the car and the medical exam of Acquino show he injured his ear when he recklessly dove into the door frame of the car during his initial assault on Rossy [1311-1312]. Acquino himself denied his right ear was injured by the air bag which was on his left side when he dove headfirst into the car [JA 1646]. The surgeon also ruled out an air bag injury to Acquino's ear. On the other hand, law enforcement found DNA from Acquino's blood all over the right side of the door

43

frame of the car [JA 2786-2787].

The scientific proof shows: a) there was no gun and no gunshot injury to Acquino as he claimed, and b) the airbag did not injure Acquino's ear, and c) his blood was on the exterior door frame that he dove into. "[T]he estate of a victim of deadly force can meet its burden on summary judgment by the use of forensic evidence that conflicts with the agents' testimony and establishes as possible a version of events that supports an argument that unreasonable force had been used." *Pub. Adm'r v. City of N.Y.*, 2009 U.S. Dist. LEXIS 18350, at *24 (S.D.N.Y. Feb. 24, 2009) (*citing, Ting v. United States of America et al.*, 927 F.2d 1504 (9th Cir. 1991).

Moreover, in this case Plaintiff also presented compelling proof from video, photos, CPS and autopsy records, and eyewitnesses supporting her case that her son was shot in cold blood. Therefore, a reasonable jury could find there was no infliction or threatened infliction of harm by Rossy and that it was Acquino who injured himself diving into the car and causing it to accelerate across the intersection into the house.

The appellants hang much of their legal argument on Acquino's claim that Timothy Best was almost run over by the Acura. This is a false argument based on a false premise. First if plaintiff's proof is accepted by a jury, the defendants were engaged in illegality from the outset and Acquino's initial unlawful use of force is what caused the SUV to careen forward into the house. Second, the proof shows that Acquino's story about the bike rider was not true and was part of the cover up.

44

The image of the unaltered crime scene obtained from WGRZ news proves Acquino's story was false in two important respects [JA 2723]. The Acura did not veer hard right but went straight forward into the house when Acquino dove on Rossy's lap. Second, Acquino jumped onto Rossy's lap at the street corner and the car shot across the street into the house. Acquino was not riding on Rossy's lap for almost a city block and there was no time for the concocted series of events in the moving car, culminating allegedly with Acquino grabbing the wheel and steering the car into the house [JA 3431-3432].

Further, eyewitness Gino Fresco was outside on the corner watching and testified in pertinent part as follows:

"Q. Did you see the white Acura nearly collide with any person or anything before it crashed into the house across the intersection?

A. Not that I can remember, no." [JA 1972].

Additionally, Tedesco never mentioned danger to a kid on a bike in his police interview just days after the events, and later testified that he did not see a kid on a bike in the path of the Acura as it drove across the intersection into the house [JA 1740-1773, 3127].

Finally, when the young witness himself took state investigators to the scene and showed where he was when the Acura hit the house, he pinpointed a location "between two large trees adjacent to the Garfield side of the home" where he was not

in danger of being hit by the moving car. [JA 2042, 2723 2671, 2677].

On the *Graham* "severity of the crime" factor, Rossy contends he committed no crime. The defendants alleged after the fact that they had seized a three inch "blunt" (that never materialized and they could not produce) as the predicate for the super aggressive cut off maneuver, and further alleged that Rossy then assaulted Acquino by yanking him into the car with his left hand. However, according to Acquino, he grabbed Rossy's right hand and pocket when he lunged into the car, making it impossible for Rossy to drive away or steer since according to Acquino, Rossy's left hand was supposedly pulling Acquino into the car by his vest [1463-1464, 1475].

A reasonable jury could conclude that Rossy committed no crime of violence, and Acquino caused the car to take off and crash by his sudden physical assault, landing on Rossy's legs and groin, all in violation of the BPD manual of procedures. Even a felony car stop is not conducted remotely in the fashion the defendants acted here [JA 2638-2640]. Further, there is the glaring and highly suspect decision of both defendants not to use their radios to report anything throughout their activities, which is totally contrary to all their training and police regulations [JA 1652, 2634-2638, 2736-2737].

A rational jury could also find that Rossy was not resisting arrest, but rather in a defensive posture protecting his head and face from a vicious beating at the hands of the defendants that began when Acquino dove into his car. According to the closest

46

eyewitnesses Rossy began to run only at the end of the onslaught, after Tedesco had clubbed him to the ground with his weapon and Acquino began screaming from the sidelines "Shoot him, Shoot him." [JA 1831-1833, 1841-1842, 2143-2144].

As held in *Gilmere v Atlanta*, "[A]ny fear on the officer's part was the fear of retaliation against his own unjustified physical abuse. We conclude that a moment of legitimate fear should not preclude liability for a harm which largely resulted from his own improper use of his official power." *Gilmere v Atlanta*, 774 F2d 1495, 1501 (11th Cir 1985) *cert. denied* 476 U.S. 1115 (1986)

It strains credulity for the appellants to claim that Rossy was an immediate threat at the moment deadly force was used. At that moment Rossy was half naked, unarmed, knocked out of his shoes, and running for his life when he was gunned down from the other end of the block [JA 1826-1827]. The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest cases don't even arise." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) *citing K.H. v. Morgan*, 914 F.2d 846, 851 (C.A.7 1990).

Simply stated there are numerous material issues relating to whether Acquino and Tedesco assaulted and robbed Rossy and then killed him knowing he was unarmed, or whether as the City Defendants claim Rossy's car was cut off due to the smell of marijuana and he then fled, crashed into the house, and was shot from behind

unarmed several minutes later because Tedesco saw Acquino's ear was injured. Even in the second scenario a reasonable jury could conclude that any threat posed by the moving vehicle had disappeared and that the subsequent beating and shooting of Rossy was excessive and unjustified.

Tedesco's initial radio call with the cooked-up story that his gun was in Rossy's car is a clear window into Tedesco's guilty state of mind after he shot Rossy in the back. Tedesco lied in his deposition about what he said, but the police audio recordings tell another story: The Truth. In fact, the police dispatcher that he worked with heard his broadcast about his gun being in Rossy's car and repeated it again to all police units. Had Tedesco reasonably believed that shooting an unarmed man from behind was justified, then he would not have made up the phony story planting his own gun in Rossy's car.

A reasonable jury could conclude that in his panicked and criminal mind after shooting Rossy, Tedesco thought he could claim he wrestled his gun back from Rossy inside the car after the crash and was thereby justified in shooting Rossy running from the scene. However, several witnesses, his three shell casings on the sidewalk, and the forthcoming forensics on the car foiled his plan. In his official statement eight days after killing Rossy, Tedesco changed his story and told investigators he never "lost control" of his weapon  [JA 1765].

In order for it to be objectively reasonable for an officer to use deadly force to

apprehend a suspect, he must have probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 3, 11 (1985). The objective reasonableness test will not be met if, on an objective basis, it is obvious that no reasonably competent officer would have concluded in that moment that his use of deadly force was necessary. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986). This is just such a rare and obvious case.

In *Gibbs v. Bridgeport*, the decedent was armed and threatening civilians and fled carrying the rifle when a police detective appeared and chased him. The District Court in a well-reasoned opinion surveying the governing case law denied qualified immunity on a summary judgment motion. The court found that while the first shot was justified, there was a genuine issue regarding the second and fatal shot seconds after the decedent dropped the rifle as to whether there was probable cause to believe the suspect was armed or imminently dangerous at that moment, and thus whether the fatal shot was excessive. *Gibbs v. City of Bridgeport*, 2018 U.S. Dist. LEXIS 147506 (*citations omitted*) The delay in using the police radio, although not as egregious as the instant case, was a factor cited in the court's decision. *Id* at *9

As the Supreme Court has made clear, there may be times when video evidence is so conclusive that it warrants the grant of summary judgment even in the face of contradictory witness statements where the video "blatantly contradict[s]" a parties self-serving testimony. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) In the instant

case, the video proof blatantly contradicts the defendants' self-serving story in many material aspects i.e. the words and actions of the defendants belie their subsequent claims that they believed Rossy presented a mortal threat, or that he had shot Acquino in the head minutes earlier.

*Garner* at its core is a factually similar case where an unarmed civilian fleeing on foot was shot in the back by police, the Supreme Court observed that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable," because "[i]t is not better that all felony suspects die than that they escape." *Id*. at 11. Instead, the Court held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Ibid*. Put differently, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Ibid*. In this case, Rossy was visibly unarmed and injured, shirtless and shoeless and objectively no threat to anyone at the time he was fired upon from behind.

Richard O'Bert was unarmed when he was killed and the Second Circuit held that "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert v. Vargo*, 331 F.3d 29, 32 (2d Cir. 2003). The fact that the decedent had earlier threatened

50

to "blow your fucking heads off" did not alter the fact that he presented no mortal threat at the moment he was shot, and "a reasonable officer in Vargo's position would not have perceived O'Bert as an immediate threat so as to necessitate the use of deadly force." *Id.* 35

The appellants have disregarded an important corollary of *O'Bert at* 37 which instructed that district courts "may not simply accept what may be a self-serving account by the police officer. Rather, the court must also consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."

In the instant case there is a boatload of evidence, both direct and circumstantial, of not only the unlawful use of force but proof of concealment and scienter on the part of both Tedesco and Acquino. A court is likely to decide that a defendant officer is not "entitled to qualified immunity if he 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and . . . the allegedly false statement was necessary to the finding of probable cause.'" *Pourkavoos v. Town of Avon*, 823 F. App'x 53, 59 (2d Cir. 2020) (*quoting Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

In this case, Acquino and Tedesco have each given demonstrably false testimony regarding material facts in the case. This includes Tedesco's false testimony

regarding his phony story which planted his gun in Rossy's car in his initial radio call; and his prevarications about when he made that transmission, falsely testifying he called it in before shooting Rossy in the back, whereas the CPS records prove it was done after he shot him dead.

Acquino gave false testimony about many material facts in the case. His testimony that he was shot inside the Acura was disproved by scientific findings, and the observations of several eyewitnesses who heard and saw no gunfire until Rossy was shot several minutes later [JA 1637]. Ultimately, the appellants still have no rational or specific explanation for Acquino's ear injury since the evidence shows as the Attorney General found, that Rossy "was not armed and did not shoot" Acquino [JA 2785].

The appellants shamelessly argue that it was still "objectively reasonable" to kill Rossy by shooting him dead at 30-40 yards because Acquino's "injury had something to do with Rossy's actions during the operation of his motor vehicle" [Appellant Brief, DktEntry 28.1 p. 37]. This flimsy language is not an expression of constitutional law on the use of deadly force by police in taking the life of a citizen. Further, a reasonable jury could accept Plaintiff's proof and conclude that Acquino knew he banged his head leaping into the car going after Rossy, and then lied about being shot to cover up a malicious beating and unlawful shooting.

Acquino's false testimony adopting the scene he staged to fit his story was

proved false by the WGRZ image of his car Unit 164 at the corner cut off location [JA 2723, 2673-2674, 1573-1575]. Grasping at straws, he then testified that the glancing side-swipe impact from the Acura knocked his police car 100 feet down the street to where it was photographed by CSU at the corner [JA 1568-1570, 2672-2673]. Acquino swore he "felt" a gun in Rossy's pocket. The Attorney General concluded based on DNA analysis and the other evidence that what Acquino removed from Rossy's pocket was the large bag of drugs, the origin of which he could not recall [JA 2786, 1693-1699]. Therefore, when Acquino left the Acura with the bag of drugs he had taken, he *knew to a certainty* that what he secreted inside his vest was not a firearm, but a "massive" clear plastic bag of drugs the size of a book [JA 1477, 1849]. Despite this knowledge, Acquino malevolently directed Tedesco to "shoot to kill" the obviously unarmed Rossy "multiple times" before Tedesco finally did it [JA 1624].

This case falls into the "obvious" category where any reasonable officer would have recognized that shooting a visibly unarmed and injured person in the back on the heels of the shocking actions of the defendants was excessive and probably criminal. The violent killing in this case was initiated by the defendants' unlawful design and conduct and cannot therefore be justified as a shooting claimed to be in self-defense.

The shooting itself was clearly not the product of a split-second decision made in the face of an imminent threat but occurred only after an extended beating that

traversed from inside the car to the lawn, into the street, and back onto the sidewalk during which Tedesco knew Rossy was unarmed. Upon hearing Acquino shouting at Tedesco "Shoot him, shoot him" Rossy got up and ran half-naked almost a full city block before Tedesco shot him from behind. Mark Van Dusen testified "The cop waited a really long time" to fire until Rossy was at the other end of the block [JA 2109]. LPN Emmanuel Ortiz testified that after Rossy began to run, Tedesco hesitated for up to ten seconds before shooting him at the end of the block. [JA 1819].

## POINT III

### INDIVIDUAL LIABILITY AND PUNITIVE DAMAGES CLAIMS AGAINST DEFENDANTS TEDESCO AND ACQUINO SHOULD NOT HAVE BEEN DISMISSED

The District Court dismissed the lawsuit against defendants Tedesco and Acquino in their individual capacities and found that they were sued only in their official capacities. In so doing, the District Court ruled that punitive damages for the defendants' conduct were not recoverable because exemplary damages are not recoverable from a defendant sued only in his representative capacity [SPA 37]. The District Court did not address whether the nature of the defendants' conduct was otherwise sufficient to support a jury's consideration of punitive damages.

This foregoing issue is subject to cross appeal because it is inextricably intertwined with the evidence showing the specific wrongful conduct of Tedesco and Acquino that raised genuine issues as to whether the shooting was justified and

resulted in the denial of qualified immunity. "A [party] who is entitled to immediate appellate review of a qualified immunity decision is also entitled to appellate review of pendant issues if those issues are 'inextricably intertwined' with the question of qualified immunity or are otherwise 'necessary to ensure meaningful review' of it." *Toussie v. Powell*, 323 F.3d 178, 184 (2d Cir. 2003).

Further, even if Judge Skretny's decision dismissing personal liability of the defendants and the claims for punitive damages is viewed as a non-final order, the Second Circuit has held that "a non-final order is inextricably intertwined with an appealable order if there is 'substantial factual overlap on the issues raised', but we have also relied upon legal overlap in analyzing whether the non-final order is inextricably intertwined with an appealable order." *Swarna v. Al-Awadi*, 622 F.3d 123, 141 (2d Cir. 2010) *citing, Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006) In this case, Margarita Rossy sued the officers "Individually and in their representative capacities" as stated in the case caption, and the body of the complaint makes out the specific conduct of each defendant officer done in violation of Rossy's constitutional rights. The complaint was supported by proof submitted on summary judgment showing their actions were egregious and malevolent, and contravened a litany of important police regulations. It is respectfully submitted that the District Court erred in finding the lawsuit did not make out claims against Tedesco and Acquino in their personal capacities, potentially allowing consideration of punitive

damages by a jury upon a full presentation of plaintiff's proof at trial.

"The district court's determination that punitive damages are unwarranted as a matter of law is reviewed *de novo*." *New Windsor Volunteer Ambulance Corps., Inc v. Meyers*, 442 F.3d 101, 121 (2d Cir. 2006) "Although a municipality itself is immune from a claim for punitive damages, that immunity does not extend to a municipal official sued in his individual capacity." *Id*. 122 (internal quotations omitted).

Punitive damages may be awarded against individuals, or those sued in their individual capacity, in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," *Smith v. Wade*, 461 U.S. 30, 56 (1983). To prevail, a plaintiff needs to show a "positive element of conscious wrongdoing." *Kolstad v American Dental Ass'n*, 527 U.S. 526, 538 (1999).

In this case there is powerful evidence that if accepted as true, proves a very troubling case of the defendant officers intentionally committing serious crimes under the color of law. The defendants knew it was Rossy and targeted him, otherwise there's no reason for the super aggressive cut-off maneuver for a mere traffic offense, nor for operating totally "off the grid", or the reckless frontal approach, each of which involved throwing the police procedure manual out the window. There is ample evidence of *mens rea* in the varied and intricate means and mechanisms used to cover up the nature and the objectives of their conduct. Equally troubling, the police

56

department in an act of self-protection issued an "exoneration" by its internal affairs unit turning a blind eye to all of the blatant misconduct, and prior history of such, all of which violated black letter provisions of the agency's own regulations [JA 1347-1353, 3427-3429].

Acquino was found to have engaged in a previous unconstitutional search and seizure in federal court regarding an arrest of July 14, 2016 resulting in the suppression of a gun. The court found based on video that Acquino threw the suspect over a counter and was "yelling at Jordan with Officer Joseph [Acquino] mere inches from Jordan's face" and after he was pepper sprayed with copious amounts and handcuffed, Joseph Acquino was punching Jordan in the face with other officers. *United States v. Jordan*, 2017 U.S. Dist. LEXIS 176115, *13-14.

In the instant case, "[if] there were sufficient evidence to permit the factfinder to infer that the responsible official was motivated by malice or evil intent or that he acted with reckless or callous indifference to the federally protected rights of the plaintiff, 'the apparent acquiescence' of the municipality would not protect the individual defendant from liability for punitive damages." *New Windsor Volunteer Ambulance Corps., Inc v. Meyers*, 442 F.3d 101, 122 (2d Cir. 2006). Further "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury." *Smith v. Wade*, 461 U.S. 30, 52 (1983).

## POINT IV
## CLAIMS FOR OFFICIAL MISCONDUCT AND FABRICATION
## OF EVIDENCE SHOULD NOT HAVE BEEN DISMISSED.

There is evidence that Tedesco and Acquino both engaged in an orchestrated cover up of their wrongdoing supported by facts in several instances that they fabricated evidence, and altered the crime scene with intent to deceive investigators, and lied to investigators to conceal what they did. Judge Skretny dismissed the claims relating to the fabrication and tampering with evidence holding that such claims were "spoliation" claims which are not recognized under New York law. The claims were presented as Due Process claims and outrageous and wanton conduct on the pleadings and proof. [JA 21, 3348-3366, 3367-3375]. The evidence of these claims is inextricably intertwined with the evidence related to the defendants' abhorrent conduct resulting in a denial of qualified immunity. *Toussie, supra*.

> This argument -- an ill-conceived attempt to erect a legal barricade to shield police officials from liability -- is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'

58

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)

Intentional falsification and suppression of evidence is objectively unreasonable as a matter of law. *See Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) ("[T]he alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise."); *see also*, *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (denying judgment as a matter of law based on qualified immunity where a jury found that a detective "misrepresented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly")  "Defendants cannot be protected by qualified immunity since they allegedly fabricated evidence." *Rogers v. Bisono*, No. 15-CV-6670, 2016 U.S. Dist. LEXIS 105096, 2016 WL 4224072, at *5 (S.D.N.Y. Aug. 9, 2016)

It is well-settled that depriving a person of their liberty by presenting fabricated evidence to a prosecuting attorney is a violation of Due Process. *See, Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000) (explaining that "the right not to be deprived of liberty as a result of any government officer's fabrication of evidence . . . was clearly established in 1996"). Substantive and procedural due process are equally offended by a government officer using fabricated evidence in a scheme to deprive a person of their life, liberty or property by presenting false proof to the Attorney General in a

criminal investigation.

The District Court held that fabrication of evidence may state a due process violation, but that Rossy and Plaintiff lacked a proceeding affected by the alleged fabrication [SPA 36] *citing, Smalls v. Collins*, 10 F.4th 117, 124 (2d Cir. 2021) and *Ricciuti, supra*. However, the fabricated and altered evidence was presented by the defendants directly to the NYS Attorney General acting as special prosecutor in the course of the homicide investigation pursuant to Executive Order [JA 2772]. Those criminal proceedings were directly affected by the materially false evidence that Acquino and Tedesco provided to the prosecutor resulting in the homicide not being presented to a grand jury for consideration [JA 2776].

Moreover, the defendants testified falsely and used the same fabricated evidence in a federal civil rights lawsuit in an attempt to defeat the vindication of Rossy's important constitutional rights under the 4th and 14th Amendments. The federal lawsuit constitutes Article III proceedings in which the falsified evidence was used by the defendants against Rossy and the Plaintiff in an attempt to injure their rights.

"[W]hile there is no constitutional right to be free from having evidence fabricated against an individual, the offense rises to a constitutional violation if one is deprived of his liberty because of the fabrication." *Henry v. City of New York*, No. 02 Civ. 4824 (JSM), 2003 U.S. Dist. LEXIS 15699, 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003) *citing Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000).

On the same principle, a constitutional due process violation lies where a person is deprived of life, liberty or property as part of a corrupt design by a government official that includes the concealment, fabrication or alteration of material evidence in order to mislead the authorities and/or defeat a claim under 42 U.S.C. §1983. U.S. Constitution Article III, Section 2

"[W]here a plaintiff can demonstrate that police have turned over fabricated evidence to the prosecutor. . . [s]uch conduct can be redressed, not as a Brady violation, but because it violates the right to not . . . be deprived of liberty on the basis of false and fabricated evidence." *Myers v. County of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011).

## CONCLUSION

The Decision and Order denying qualified immunity to the appellants should be upheld, and the claims against Tedesco and Acquino for personal liability and punitive damages should be reinstated for jury determination. The Due Process claims for the falsification of evidence that the defendants presented to the Attorney General should be reinstated for trial.

Dated:      August 6, 2024
              Buffalo, New York

/s/ *Nelson S. Torre*
NELSON S. TORRE, ESQ.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Plaintiff-Appellee-Cross-Appellant brief contains 15,132 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2013 in Times New Roman, 14 point.

Dated:     August 6, 2024
            Buffalo, New York

/s/ *Nelson S. Torre*
NELSON S. TORRE, ESQ.